EL PUEBLO DE PUERTO RICO, apelado, *v.* BENJAMÍN ROSARIO IGARTÚA, acusado y apelante.

*Número:* CR-89-26 *Resuelto:* 26 de febrero de 1992

1056

*Carmen Ana Rodríguez Maldonado* y *Enrique Rivera Mendoza*, abogados del apelante; *Norma Cotti Cruz, Subprocuradora General*, e *Iván F. Fuster, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Sr. Benjamín Rosario Igartúa apela ante esta Curia para que revoquemos una sentencia del Tribunal Superior, Sala de Arecibo, que lo halló culpable de violar el Art. 404 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404. En su apelación sostiene que el Tribunal Superior se equivocó al admitir una prueba que fue obtenida por un guardia de seguridad de la Autoridad de Tierras después de un arresto ilegal y de un registro irrazonable. Su apelación nos permite examinar la aplicabilidad del Art. II, Sec. 10 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, cuando un empleado público, que funge como guardia de seguridad, arresta a un ciudadano. Revocamos.

.

## I

El 26 de abril de 1988 el guardia de seguridad armado de la Autoridad de Tierras, Luis Pacheco Rivera, se encontraba cumpliendo su turno de 6:00 A.M. a 2:00 P.M. en la fábrica de jugos de piña Lotus. La fábrica había estado confrontando problemas debido a que algunos empleados y visitantes sustraían del lugar latas de jugo y herramientas. Para ello se implantó un sistema de registros sorpresivos a la hora de salida de los empleados. Un letrero a la entrada avisaba la posibilidad de dichos registros.

A eso de las 6:45 A.M., Pacheco y cuatro (4) o cinco (5) compañeros se dispusieron a registrar los bultos de los empleados que salían de la planta. A esa misma hora salió de su trabajo Rosario Igartúa. Éste llevaba una bolsa de papel de estraza en las manos y alegadamente, al ver que se estaba llevando a cabo un registro, viró y comenzó a caminar en dirección hacia la fábrica. Al ver el cambio de rumbo del empleado y temiendo la posibilidad de que fuese a avisar a sus compañeros que se estaba realizando un registro, Pacheco Rivera corrió detrás de él para detenerlo.

De la declaración jurada prestada por el guardia el 5 de mayo de 1988 y de su testimonio el día del juicio, surge que lo siguió hasta que se detuvo antes de llegar a un monte detrás de la fábrica. Entonces, lo agarró por un brazo y la bolsa se cayó al suelo. Inmediatamente el guardia lo esposó y recogió la bolsa. En su declaración jurada el guardia narró los eventos de la manera siguiente:

> Que cuando yo le di alcance, *que lo toqué* por los *hombros, soltó la bolsa que llevaba* en las *manos, entonces* yo le puse un lado de las esposas en una de las manos de él, *cogí la bolsa que había soltado*, y lo llevé hasta la caseta, y le entregué la bolsa que le había ocupado a mi supervisor Isabelino Torres Díaz. (Énfasis suplido.) Declaración jurada de 5 de mayo de 1988.

Por otro lado, el día del juicio Pacheco Rivera ratificó que cuando lo detuvo, Rosario Igartúa tenía la bolsa en la mano:

FISCAL CRISTOBAL GALLARDO RODRIGUEZ
¿Y que pasó si algo?
TESTIGO:
Pues que antes de llegar al monte casi internándose pues se cansó, yo no se, que se paró y entonces fue cuando yo le di alcance y dejó caer una bolsa, la bolsa que llevaba en las manos y ahí fue que lo cogí, cogí la bolsa y lo traje hasta la fábrica. T.E. pág. 17.

Más adelante en su testimonio declaró:

FISCAL CRISTOBAL GALLARDO RODRIGUEZ
¿De qué habló usted con él allí?
TESTIGO:
¿Cuando lo detuve?
FISCAL CRISTOBAL GALLARDO RODRIGUEZ
*Cuando lo detiene con la bolsa en las manos*, la bolsa de estrasa.
TESTIGO:
No, no hablé, viré para atrás, lo llevé hacia la casilla del guardia. (Énfasis suplido.) T.E., pág. 44.

A preguntas del abogado de la defensa, Pacheco Rivera manifestó que la bolsa se le cayó de las manos a Rosario Igartúa cuando Pacheco Rivera lo agarró por los hombros:

LCDO. RAFAEL CAPELLA ANGUEIRA
No, eh, ¿y usted manifestó que usted le da alcance?
TESTIGO:
Sí.
LCDO. RAFAEL CAPELLA ANGUIERA
*¿Y usted lo agarra por los hombros?*
TESTIGO:
*Por un brazo.*
LCDO. RAFAEL CAPELLA ANGUIERA
*Por un brazo. ¿Y cuando lo agarra por ese brazo, eh, se le cayó algo a él?*
TESTIGO:
*Soltó una bolsa.*
LCDO. RAFAEL CAPELLA ANGUIERA

*Se cayó algo al piso, una bolsa, dice usted de papel estrasa, ¿y qué hace en ese momento usted con esa bolsa?*
TESTIGO:
*Pues como yo lo tenía cogío por un brazo cogí y viré con él hacia la caseta del guardia.* (Énfasis suplido.) T.E., pág. 33.

Por su parte, el foro de instancia concluyó que cuando el guardia de seguridad "logró darle alcance, el acusado *soltó* la bolsa que llevaba en la mano la cual *cayó en sus pies* siendo recogida por dicho guardián y trasladada hasta la oficina de los guardianes junto con el acusado". (Énfasis suplido.) *Exhibit* I, pág. 2.

Pacheco llevó a Rosario Igartúa hasta la caseta de vigilancia y le entregó la bolsa a Isabelino Torres, supervisor general de la guardia de seguridad en la fábrica Lotus. Según surge de la transcripción de la prueba, Torres pudo corroborar inmediatamente que debido al aspecto físico de la bolsa y su sensación al tacto no era posible que contuviera latas de jugo o herramientas. Admitió que le daba la impresión de que lo que tenía Rosario Igartúa en la bolsa era un suéter y que debido a ello no la registraron en su presencia. Después de tenerlo esposado durante diez (10) o quince (15) minutos, le dijo que se fuera y regresara a las 3:00 P.M. ese mismo día para una investigación administrativa.

No obstante, aunque dejaron libre a Rosario Igartúa y éste se retiró del lugar, el guardia de seguridad retuvo la bolsa en su posesión y más tarde la abrió y vio su contenido. Del contrainterrogatorio del jefe de la guardia se desprende claramente que la costumbre era registrar las bolsas de los empleados en su presencia y que en el caso de autos el registro fue efectuado después que Rosario Igartúa había sido autorizado a salir del lugar:

Lcdo. Rafael Capella Angueira:
Sobre lo que el compañero ha preguntado. ¿Mire, usted dice que las personas que entren y salgan están abiertas a ser registradas?

Testigo:
 Cuando salen.
Lcdo. Rafael Capella Angueira:
 Cuando salen. ¿Este, cuando se les registra y se les registrase alguna bolsa, mire a ver si es cierto o no es cierto que se les registra en presencia de ella?
Testigo:
 Sí.
Lcdo. Rafael Capella Angueira:
 *¿Ellos ven el registro? ¿Y los trabajadores, cuando se los registra, se les registra en presencia de ellos también, cierto?*
Testigo:
 *Sí.*
Lcdo. Rafael Capella Angueira:
 ¿Mire a ver si es cierto o no es cierto como usted ha declarado, aquí, a este joven, *no se le registró la bolsa en su presencia?*
Testigo:
 *Porque él no estaba, se había ido.* T.E., pág. 46.

Al registrar la bolsa en ausencia del acusado, los guardias de seguridad encontraron una sustancia cuya textura sugería que podría ser marihuana. Después de efectuar el registro de la bolsa, a eso de las 10:30 de la mañana, o sea, cerca de cuatro (4) horas más tarde del arresto, procedieron a llamar a la Policía de Puerto Rico. Los agentes se presentaron a la fábrica y se llevaron la bolsa para someter su contenido a los análisis de laboratorio correspondientes. Como resultado de este análisis por la Policía se determinó que la sustancia hallada en la bolsa era picadura de marihuana.

Conforme a las instrucciones que recibió de los guardias, a las 3:00 P.M. de ese mismo día, Rosario Igartúa se presentó a la oficina del señor Santiago, Director de Personal. En ese momento el acusado explicó que esa mañana al acercarse al portón de la planta se acordó que se le habían quedado unas llaves en la fábrica y decidió regresar a buscarlas. Sin embargo, el señor Santiago salió de la oficina y ordenó que se llamara a la Policía para informarle que Rosario Igartúa estaba allí. Cuando regresó le informó

al acusado que estaba suspendido de empleo y sueldo. Acto seguido, entró a la oficina el agente Joel Peña, quien procedió a leerle los derechos a Rosario Igartúa y a arrestarlo por violación a la Ley de Sustancias Controladas de Puerto Rico.

Rosario Igartúa fue conducido al pueblo de Quebradillas ante el juez de turno y, luego que se determinara causa probable por el delito imputado, quedó libre bajo fianza.

El 20 de septiembre de 1988 la representación legal de Rosario Igartúa presentó una moción de supresión de evidencia alegando que la intervención y el registro realizado el 26 de abril de 1988 fueron ilegales y que la evidencia era inadmisible. La moción fue declarada sin lugar.

El 13 de diciembre de 1988 se celebró juicio por tribunal de derecho contra Benjamín Rosario Igartúa. Durante el juicio los dos guardias de seguridad testificaron nuevamente. Al finalizar la prueba de cargo, la representación legal del acusado solicitó nuevamente la supresión de la evidencia incautada y adujeron que de los testimonios vertidos se desprende que ellos no tenían motivos fundados para la detención del acusado y su registro posterior. Después de concluido el desfile de la prueba y las respectivas argumentaciones finales, la corte sentenciadora procedió a declarar culpable al acusado del delito imputado. El 6 de marzo de 1989 fue sentenciado a tres (3) años con el beneficio de una sentencia suspendida.

De esta sentencia apela ante nos Rosario Igartúa señalando que:

> ... Erró el Honorable Tribunal de Instancia al declarar sin lugar la supresión de la evidencia ocupada, por ser la misma el producto de una intervención y posterior registro ilegal, en violación de los derechos constitucionales garantizados al apelante. Alegato del apelante, pág. 9.

Para evaluar adecuadamente los méritos del error señalado procede que examinemos las disposiciones de las Re-

glas de Procedimiento Criminal que gobiernan cuándo y quiénes pueden realizar un arresto sin orden en Puerto Rico. Corresponde posteriormente que decidamos cuál de dichas disposiciones es aplicable al caso de autos para entonces pasar juicio sobre si se actuó conforme a ella. Procede, además, que evaluemos la razonabilidad del registro efectuado.

## II

■ La Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que regula el arresto sin orden realizado por un funcionario del orden público, dispone:

> Un funcionario del orden público podrá hacer un arresto sin la orden correspondiente:
> (a) Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito en su presencia. En este caso deberá hacerse el arresto inmediatamente o dentro de un término razonable después de la comisión del delito. De lo contrario el funcionario deberá solicitar que se expida una orden de arresto.
> (b) Cuando la persona arrestada hubiese cometido un delito grave (*felony*), aunque no en su presencia.
> (c) Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave (*felony*), independientemente de que dicho delito se hubiere cometido o no en realidad.

■ La Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, por su parte, gobierna el procedimiento que se ha de seguir cuando quien arresta es un ciudadano privado:

> Una persona particular podrá arrestar a otra:
> (a) Por un delito cometido o que se hubiere intentado cometer en su presencia. En este caso deberá hacerse el arresto inmediatamente.
> (b) Cuando en realidad se hubiere cometido un delito grave (*felony*) y dicha persona tuviere motivos fundados para creer que la persona arrestada lo cometió.

Corresponde, entonces determinar inicialmente si el guardia de seguridad Luis Pacheco Rivera era funcionario del orden público o ciudadano particular para fines de estas reglas.

▬ Nuestras Reglas de Procedimiento Criminal guardan silencio sobre lo que significa "funcionario del orden público". No obstante, en *Pueblo v. Velazco Bracero*, 128 D.P.R. 180 (1991), nos pronunciamos sobre estos extremos. Uno de los criterios esbozados es si a ese funcionario se le ha otorgado autoridad por ley para efectuar arrestos en el desempeño de sus funciones. En aquel caso resolvimos que el policía Alonso Vázquez, al igual que los demás guardias de la Administración de Veteranos, podían realizar arrestos dentro de la institución, al amparo de la Regla 11 de Procedimiento Criminal, *supra*, cuando la actividad realizada por el arrestado violara una ley federal y además estuviera proscrita en nuestras leyes penales.

▬ Totalmente diferente es el caso de autos. Ni de la ley habilitadora de la Autoridad de Tierras, Ley Núm. 26 de 12 de abril de 1941 (28 L.P.R.A. sec. 241 y ss.), ni de los autos surge que la Autoridad de Tierras tiene facultad para nombrar policías con poder de efectuar arrestos en calidad de funcionarios del orden público al amparo de la Regla 11 de Procedimiento Criminal, *supra*. Si bien es cierto que el Art. 8(p), 28 L.P.R.A. sec. 261(p), autoriza a la Autoridad de Tierras a nombrar "funcionarios, agentes y empleados" y conferirles las facultades que sean delegables, no podemos concluir que esta facultad incluye el poder para crear un cuerpo policíaco con poderes análogos a la Policía de Puerto Rico con autoridad para realizar un arresto sin orden, al amparo de la Regla 11 de Procedimiento Criminal, *supra*. No hay ni un ápice de prueba en el expediente que demuestre que el guardia de seguridad Pacheco estaba autorizado a realizar arrestos en calidad de funcionario del orden público.

■ Por el contrario, la propia resolución enmendada del tribunal de instancia, al denegar la supresión de evidencia, reconoció que Pacheco actuaba como ciudadano privado y no como un "funcionario del orden público":

> Señalamos además que la actuación de este guardia se realizó en su carácter de ciudadano particular, o sea, que no existía un acuerdo previo con los agentes del orden público por lo que siendo así no resulta oponible la garantía constitucional contra registros irrazonables." *Exhibit* I, págs. 3–4.

■ Aunque muchas entidades públicas y privadas contratan agencias de seguridad privada y tienen empleados a cargo de la protección de sus propiedades, estos guardias particulares no son "funcionarios del orden público" bajo la Regla 11 de Procedimiento Criminal, *supra. Pueblo v. Velazco Bracero,* supra. Por ende, al efectuar arrestos su autoridad emana de la Regla 12 de Procedimiento Criminal, *supra,* y es necesario que cumpla con los requisitos allí provistos. En particular, la Regla 12 de Procedimiento Criminal, *supra,* requiere que tenga certeza de que se ha cometido o intentado cometer un delito en su presencia o que tenga motivos fundados para creer que la persona arrestada cometió un delito grave que en realidad se. había cometido. Nuestro ordenamiento, además, requiere que la persona particular efectúe el arresto inmediatamente y lo entregue a un funcionario del orden público o lo lleve "sin demora innecesaria ante el magistrado disponible más cercano ...". Regla 22(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño,* 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1989, Sec. 5.71, pág. 47.

■ De los autos del caso se desprende que el guardia de seguridad Luis Pacheco Rivera admitió que al correr detrás de Rosario Igartúa lo hizo para evitar que le avisara a los otros empleados que se estaba realizando un registro de sus pertenencias en la salida. Cuando lo siguió, Rosario

Igartúa no había cometido ningún delito en su presencia. Tampoco tenía información de que en realidad se había cometido un delito grave ni tenía motivos fundados para creer que Rosario Igartúa lo había cometido. No obstante, el guardia corrió detrás de Rosario Igartúa y, al éste detenerse, lo agarró por los hombros y lo esposó. Cogió el bolso que se le había caído a Rosario Igartúa cuando "lo agarró por los hombros" y se lo llevó a la caseta de seguridad. Al detener y esposar a Rosario Igartúa, el guardia de seguridad efectuó un arresto. En las circunstancias particulares en que esto ocurrió, al arrestarlo incumplió con la Regla 12 de Procedimiento Criminal, *supra*, y por ende, su actuación fue ilegal.

Una vez establecido que el arresto fue ilegal, procede que evaluemos si el registro realizado posteriormente es irrazonable.

### III

Al examinar la controversia de autos partimos de la premisa que "sujeto a contadas excepciones de alcance rigurosamente definido, la garantía contenida en la Sec. 10 del Artículo II de la Constitución de Puerto Rico cubre tanto los registros administrativos como los penales. La regla general es, en consecuencia, que todo registro, allanamiento o incautación que se realice, no importa su índole penal o administrativa, es irrazonable per se de llevarse a cabo sin orden judicial previa ... a menos que se consienta al registro, directa o indirectamente, o circunstancias de emergencia requieran lo contrario y el peso de los intereses en conflicto exija una solución distinta". *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207–208 (1984). Recientemente, al reafirmar esta doctrina reconocimos que "[l]os valores centrales protegidos por dicha garantía son la intimidad del ser humano y su dignidad innata". *Pueblo v. Ríos Colón*, 129 D.P.R. 71, 80 (1991).

Al amparo de esta norma, un arresto realizado por un funcionario del orden público en violación a nuestro ordenamiento procesal y constitucional trae como consecuencia que cualquier registro posterior al mismo sea ilegal y que sus frutos sean inadmisibles en un proceso judicial. *Pueblo v. Soto*, 71 D.P.R. 830 (1950); *Pueblo v. López Rivera*, 89 D.P.R. 791 (1964); *United States v. Di Re*, 332 U.S. 581 (1948); *Wong Sun v. United States*, 371 U.S. 471 (1963); *United States v. Watson*, 423 U.S. 411 (1976).

Sin embargo, en la jurisdicción federal la Cuarta Enmienda y su corolario, la regla de exclusión, sólo se extienden a actuaciones gubernamentales y, por lo tanto, no son invocables cuando el registro es realizado por ciudadanos particulares. Véase, a manera de ejemplo, *Burdeau v. McDowell*, 256 U.S. 465 (1921). En esa decisión el Tribunal Supremo federal resolvió expresamente que la Cuarta Enmienda era una limitación frente al Estado y que evidencia obtenida como producto de un registro ilegal realizado por una persona particular no tenía que ser excluida en un proceso penal. Véanse: *United States v. Jacobsen*, 466 U.S. 109 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

No obstante, cuando se demuestra que el ciudadano particular actuó como agente o instrumento del Estado, a instancias o en cooperación con el Gobierno, se activa la protección. Véase 1 *La Fave, Search and Seizure* Sec. 1.8(d) (1987); E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. 1, Sec. 6.27A.

Aunque no existe un método uniforme para determinar cuándo una actuación de una persona particular constituye una acción del Estado, el Tribunal Supremo federal esbozó unos criterios para evaluar si determinada actuación constituye acción estatal:

Primero, la privación tiene que ser causada por el ejercicio de algún derecho o privilegio creado por el Estado o por una regla de conducta impuesta por el Estado o por una persona de quien el Estado es responsable .... Segundo, la parte a quien se le imputa la privación tiene que ser una persona de quien razonablemente se pueda decir que es un actor del Estado. Esto puede ser porque es un oficial del Estado, porque ha actuado en conjunto o ha obtenido asistencia significativa de oficiales del Estado o porque su conducta es de otra forma atribuible al Estado. (Traducción nuestra.) *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Véanse, además: L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Sec. 18.1 y ss.; 2 *Constitutional Law: Substance and Procedure* Sec. 16.1 y ss. (1986).

La determinación de qué tipo de acción gubernamental activa la protección constitucional es un asunto complejo que generalmente requiere un cuidadoso análisis de las circunstancias particulares de cada caso. En situaciones en las que con frecuencia surge la necesidad de distinguir la naturaleza de la participación gubernamental es en los casos en que ha mediado la intervención de personal de seguridad privada en la investigación y detección del crimen. Véanse: S. Euller, *Private Security and the Exclusionary Rule*, 15 Harv. C.R.-C.L. L. Rev. 649 (1980); Anotación, *Admissibility, in Criminal Case, of Evidence Obtained by Search by Private Individual*, 36 A.L.R.3d 553, 567–571 (1971).

En su ilustrada obra sobre el derecho procesal penal, el profesor Chiesa examina los casos de agentes de seguridad privada y concluye:

Una zona especial la constituye la "seguridad privada", esto es, los agentes de seguridad en el sector privado, encargados de la vigilancia de establecimientos comerciales, escuelas, condominios, etc.; también caben aquí los detectives o investigadores de seguros. Se favorece aquí la aplicación de la protección en virtud de que estos agentes, guardias o detectives privados ejercen una función pública estrechamente vinculada al procedimiento criminal. (Escolio omitido.) Chiesa, *op. cit.*, pág. 508.

# IV

Sin embargo, el Tribunal Supremo de Estados Unidos nunca se ha enfrentado a una controversia como la de autos, a saber, si un arresto en violación al equivalente de nuestra Regla 12 de Procedimiento Criminal, *supra*, realizado por un *empleado gubernamental*, activa la regla de que todo registro posterior a un arresto ilegal es irrazonable y contrario a la Cuarta Enmienda de la Constitución federal. No obstante, algunos estados se han expresado sobre la aplicabilidad de la garantía contra registros irrazonables en casos análogos al de autos. Veamos.

En 1979 el Tribunal Supremo de California extendió la protección constitucional contra registros y allanamientos para incluir los registros incidentales a arrestos realizados por personas particulares. El referido foro expresó que:

> "...[C]uando un guardia de seguridad privada realiza un registro o allanamiento ilegal mientras está involucrado en un arresto por persona privada autorizada estatutariamente en asistencia de las autoridades de orden público, las prohibiciones constitucionales son aplicables. (Traducción nuestra.) *People v. Zelinski*, 594 P.2d 1000, 1006 (Cal. 1979).

Por otro lado, el Tribunal Supremo de Louisiana también se pronunció sobre la validez de un registro en una situación extremadamente parecida a la de autos. *State v. Longlois*, 374 So. 2d 1208 (1979). En ese caso, un agente del Departamento de Recursos Naturales del estado de Louisiana arrestó a dos (2) individuos por poseer marihuana, y en la apelación correspondiente el Tribunal Supremo de ese estado invalidó tanto el arresto como el registro. Dicho foro apelativo concluyó que el agente de recursos naturales no estaba expresamente autorizado a realizar arresto en calidad de funcionario del orden público. Por ende, el arresto fue efectuado al amparo de la disposición del Código de Procedimiento Criminal que autoriza a un ciuda-

dano particular a realizar arrestos. Como en Louisina un ciudadano sólo puede arrestar por delito grave, y la posesión de marihuana es menos grave, el arresto realizado fue ilegal. Ese Tribunal Supremo, sin entrar a considerar los requisitos de *state action*, concluyó que el registro realizado también fue ilegal y su producto era inadmisible en los tribunales de justicia en virtud de *Mapp v. Ohio*, 367 U.S. 643 (1961).

En Puerto Rico es forzoso llegar a un resultado como éste. El propósito de la regla de exclusión de toda evidencia que se ocupe como producto de un arresto ilegal es evitar que *el Estado* se beneficie de una intervención indebida con un ciudadano y el proceso judicial se contamine con una evidencia obtenida mediante un arresto ilegal efectuado por un guardia de seguridad privado que "ejerc[ía] una función pública [estrictamente] vinculada al procedimiento criminal". (Escolio omitido.) Chiesa, *op. cit.*, pág. 508.

La figura de la función pública parte de la premisa que si personas privadas realizan actividades que tradicionalmente le competen al Estado estarán sujetas a las correspondientes restricciones constitucionales. Bajo esta vertiente, el Estado no puede liberarse de su responsabilidad constitucional en la operación gubernamental meramente delegando ciertas funciones a entes privados. J.E. Nowak, R.P. Rotunda y J.N. Young, *Constitutional Law*, Minneapolis, Ed. West Publishing Co., 1986, Sec. 16.2, pág. 163. Para casos de función pública, véase a modo ejemplificante: *Marsh v. Alabama*, 326 U.S. 501 (1946); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974); *Evans v. Newton*, 382 U.S. 296 (1966); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978). Véase, además, R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, Cap. IX, Sec. 1-B, pág. 802 y ss.

Un análisis de la situación factual de este caso bajo los criterios de *Lugar v. Edmondson Oil Co.*, supra, revela que la invasión a la dignidad e intimidad del apelante fue causada por una persona *en función de un privilegio concedido por el Estado*. El guardia de seguridad Pacheco actuó conforme a una autoridad concedida a él y a cualquier ciudadano por la Regla 12 de Procedimiento Criminal, *supra*. El Estado lo autorizó en determinadas circunstancias a realizar arrestos y, por ende, se cumplió con el primer requisito expuesto por *Lugar v. Edmondson, Oil Co.*, supra.

El segundo requisito establecido es que la parte a la que se le imputa la ofensa pueda ser considerada como *state actor* o actor del Estado. Estamos ante esta figura cuando se actúa como oficial estatal, se ha actuado con asistencia estatal o porque la conducta es atribuible al Estado. Pacheco era un empleado de seguridad de la Autoridad de Tierras, una corporación pública del Estado Libre Asociado, y, por consiguiente, un empleado público. Él estaba asignado a la planta de jugos de piña Lotus de la Autoridad de Tierras en Barceloneta. En ese lugar, estaba asignado al puesto de control de la entrada y, entre otras funciones, evitaba e investigaba el robo de mercancía elaborada allí. De la prueba vertida se desprende que Pacheco Rivera tenía a su cargo el registro de los empleados para investigar si se estaban apropiando de mercancía. Su función no era meramente la de evitar el robo de mercancía, pues participaba en los registros e investigación que originaban una denuncia. Como parte de sus funciones él portaba un arma y efectuaba arrestos al amparo de la Regla 12 de Procedimiento Criminal, *supra*. Velaba, por lo tanto, por que se protegiera un interés gubernamental y *su conducta era atribuible al Estado*.

Si bien es cierto que en *Collins v. Womancare*, 878 F.2d 1145 (9no Cir. 1989), se resolvió que el hecho de que un

ciudadano privado se amparase en la regla que le permite realizar arrestos no es suficiente para que se configure el *state action*, de acuerdo con los criterios de *Lugar v. Edmondson Oil Co.*, supra, ni allí ni en los casos allí citados se trataba de un empleado gubernamental. Todos eran ciudadanos eminentemente privados, sin más conexión con el Estado que la autorización por ley para realizar arrestos. Satisfacían exclusivamente el primer criterio de *Lugar v. Edmondson Oil Co.*, supra, y no el segundo, elemento indispensable en la adjudicación de si hay acción del Estado.

 Resolvemos en consecuencia que un empleado gubernamental en funciones análogas a las de un policía estatal, pero que no tenga autoridad expresa en ley para arrestar, está autorizado a realizar arrestos únicamente cuando concurran los requisitos de la Regla 12 de Procedimiento Criminal, *supra*. Resolvemos, además, que habiendo acción estatal en este tipo de intervención, el sospechoso es acreedor a la protección constitucional del Art. II, Sec. 10 de nuestra Constitución, *supra*, por lo que cualquier registro posterior a un arresto en violación a la Regla 12 de Procedimiento Criminal, *supra*, es ilegal y la evidencia obtenida inadmisible en nuestros tribunales de justicia.

## IV

A modo de epílogo, atendemos las preocupaciones manifestadas en la opinión disidente del Juez Asociado Señor Negrón García, que fundamentalmente propone que adoptemos en nuestra jurisdicción lo resuelto por el Tribunal Supremo federal en *California, Petitioner v. Hodari D.*, 59 L.W. 4335 (1991).

 Es norma reiterada en Puerto Rico que cualquier registro que se realiza sin una orden judicial previa goza de una presunción de invalidez sujeta sólo a ciertas limitaciones y excepciones. *Pueblo v. Lebrón*, 108 D.P.R.

324 (1979); *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986), entre otros. La carga probatoria de demostrar que el registro efectuado sin orden está justificado la tiene el Ministerio Fiscal. Reglas 14 y 15 de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Vázquez Méndez*, supra. Así, por ejemplo, el Estado puede esbozar como justificación a un registro sin orden que éste se efectuó incidentalmente a un arresto legal cuando lo que se registra es el área bajo el control del arrestado; que el arrestado consintió al registro; que el objeto registrado estaba a plena vista o abandonado, o que se trata de un registro de emergencia. *Pueblo v. Castro Rosario*, 125 D.P.R. 164 (1990); Chiesa, *op. cit.*, Sec. 6.14, pág. 409. A menos que no esté presente una de estas excepciones, una orden previa es necesaria para la realización del registro.

No encontramos nada en los hechos de este caso que parezca indicativo que nos encontramos ante una de las excepciones. En primer lugar, no podemos clasificar el registro de la bolsa, propiedad de Rosario Igartúa, como uno incidental a un arresto legal. Dos (2) fundamentos apoyan esta conclusión.

 Acudimos en primer lugar a las reglas que gobiernan el registro incidental al arresto legal. En *Pueblo v. Sosa Díaz*, 90 D.P.R. 622, 631 (1964), establecimos que:

> ...[L]a regla que autoriza registros coetáneos con un arresto legal se justifica por la necesidad de ocupar armas u otros objetos que puedan utilizarse para escapar a la detención, así como por la necesidad de evitar la destrucción de evidencia relacionada con la comisión del delito, pero esta justificación desaparece cuando el registro es remoto en tiempo y lugar al arresto. "Una vez el acusado ha sido arrestado y colocado bajo custodia, entonces un registro hecho en otro lugar, sin un mandamiento, simplemente no es incidental al arresto." Véase *Stoner* v. *California*, 376 U.S. 483, 32 U.S.L. Week (U.S. Marzo 23, 1964) 4227.

 Aunque en aquel caso estábamos ante el regis-

tro de un vehículo, posteriormente, en *Pueblo v. Costoso Caballero*, 100 D.P.R. 147 (1971), usamos los mismos criterios para evaluar la razonabilidad del registro de los efectos personales del arrestado, a saber: es razonable el registro del arrestado y el área bajo su control inmediato para ocupar armas y evitar que el arrestado pueda resistir el arresto, escapar o destruir o desaparecer evidencia relacionada con el delito por el cual se arresta. Véase *Chimel v. California*, 395 U.S. 752 (1969). Sobre este particular se ha expresado el profesor Chiesa al resumir la normativa puertorriqueña sobre registro incidental a arresto:

> En Puerto Rico, la validez del registro incidental al arresto supone dos requisitos esenciales:
> (i) lo que se registra: el registro es razonable sólo cuando se registra a la persona del arrestado y aquello bajo su control;
> (ii) para lo que se registra: el propósito ha de ser evitar que el arrestado pueda oponer resistencia, escapar o de alguna manera desaparecer o destruir evidencia.
> En cuanto al momento del registro, éste debe hacerse en un momento en que esté presente el segundo requisito. Si el registro se hace cuando ya lo registrado está fuera del control del arrestado, no es razonable. Chiesa, *op. cit.*, pág. 424.

De la transcripción de evidencia se desprende claramente que el registro efectuado al apelante fue irrazonable por realizarse en un momento remoto al arresto cuando el apelante no se encontraba en el lugar. Por ende, el registro se efectuó sobre una pertenencia que no estaba bajo su control. En estas circunstancias no es aplicable la doctrina del registro incidental a un arresto y la prueba obtenida debe ser excluida.

Es precisamente por esta razón, entre otras, que no tenemos que pasar juicio sobre la aplicabilidad a la situación del caso de autos lo resuelto por el Tribunal federal en *California, Petitioner v. Hodari D.*, supra. El tiempo transcurrido, en aquel caso, entre el registro y el arresto fue ínfimo. Ocurrieron casi en momentos simultáneos.

De todas maneras, en el caso de autos, a diferencia del de *California, Petitioner v. Hodari D.*, supra, la sumisión de Rosario Igartúa a la demostración de autoridad de Pacheco ocurrió en un momento anterior a la incautación y al registro de la bolsa. *California, Petitioner v. Hodari D.*, supra, es claramente inaplicable. El propio guardia de seguridad aceptó que "antes de llegar al monte ... [Rosario Igartúa] se cansó ... que se paró y entonces fue cuando yo le di alcance y dejó caer una bolsa ...". T.E., pág. 17. En su determinación, el Tribunal Superior expresamente concluyó que la bolsa se cayó en los pies del peticionario después que lo detuvieron.

La persecución efectuada por Pacheco Rivera constituyó una muestra inequívoca de autoridad mediante la cual se le comunicaba a "una persona razonable" que no estaba libre para rehusar a someterse. Al detenerse, Benjamín Rosario Igartúa se sometió. Fue posteriormente que dejó caer la bolsa y ésta cayó en sus pies.

■ La intervención ilegal inicial al arrestarse a Rosario Igartúa sin que concurrieran los elementos requeridos por las Reglas 11 y 12 de Procedimiento Criminal, *supra*, vició cualquier registro subsiguiente. La bolsa de marihuana —aún bajo *California, Petitioner v. Hodari D.*, supra— era, pues, inadmisible en la causa criminal contra Benjamín Rosario Igartúa.([1])

■ Finalmente, al revocar el fallo recurrido ratificamos la ya arraigada norma de origen constitucional de que "un registro no se convierte en razonable por el mero hecho de que se ocupe evidencia que tienda a establecer la comisión de un delito". *Pueblo v. Sosa Díaz*, supra, pág. 631.

---

([1]) Cabe señalar que como la bolsa fue ocupada a los pies del acusado, difícilmente puede concluirse que al igual que *California, Petitioner v. Hodari D.*, 59 L.W. 4335 (1991), la arrojó.

Por los fundamentos expuestos, *se revoca la sentencia condenatoria recurrida.*

El Juez Asociado Señor Negrón García emitió una opinión disidente.

## – O –

Opinión disidente del Juez Asociado Señor Negrón García.

## I

Nuestro disentir en este recurso se nutre del siguiente marco conceptual.

*Primero*, en Puerto Rico rige el principio de que este foro apelativo no intervendrá en la adjudicación de credibilidad efectuada en primera instancia por el juzgador de los hechos.[1] Ese juzgador está en mejor posición para aquilatar los testimonios vertidos en su presencia y apreciar las expresiones no verbales —gestos, miradas, etc.— no reproducidas en una transcripción o exposición narrativa. Sustituir determinaciones de hechos resultantes de la observación directa del comportamiento y reacciones de los testigos, por uno derivado de la mera lectura de una transcripción o exposición narrativa, "significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción". *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 648 (1986).

*Segundo*, si bien en el ámbito civil, de ordinario, nuestra función está auxiliada por determinaciones de hecho expresamente formuladas en el dictamen, esa ventaja no

---

[1] Con carácter de excepción, en *Pueblo v. Millán Meléndez*, 110 D.P.R. 171 (1980), reiteramos que la pasión, perjuicio o error manifiesto activan nuestra intervención en asuntos de credibilidad.

existe en lo criminal.(²) En lo penal, frecuentemente el cuadro fáctico presentado es limitado y el alterarlo conlleva inherentemente un peligro mayor de que cometamos una injusticia producto, más que oficinesco, de la omisión o mala apreciación de uno o varios hechos que, en otras circunstancias, activarían una norma de derecho distinta.

Y *tercero*, la ausencia de determinaciones de hecho en las apelaciones criminales dificulta y limita más nuestra función apelativa. Ese conocimiento lo obtenemos de la transcripción de evidencia o exposición narrativa. De esta forma, si bien tenemos ante nos la prueba testifical desfilada en el juicio, carecemos de determinaciones específicas sobre cuál fue o no la creída. La cuestión es *crucial*. Si en el curso normal de un juicio criminal se presenta determinada prueba conflictiva —producto del directo o del contrainterrogatorio— sin el beneficio de una determinación formal de hechos, como tribunal apelativo, ¿qué versión fáctica debe utilizarse para elaborar el dictamen?

Mientras no se desarrolle otro método más rápido y confiable, la fidelidad al principio de no intervención con la apreciación de la prueba y el dictamen final del juzgador —fallo inculpatorio— ha de guiar inicialmente el estudio apelativo de la prueba presentada en instancia.

Y es que en esta etapa, la culpabilidad, como dictamen, está basada en la premisa de que se probó más allá de duda razonable cada uno de los elementos del delito imputado. Corresponde, pues, al apelante demostrar que la prueba desfilada no satisfizo ese *quantum* requerido. De esta forma, si de la transcripción de evidencia o exposición narrativa surge que hubo alguna prueba conflictiva sobre uno de los elementos del delito, y el apelante no impugna exitosamente la suficiencia de la totalidad de la prueba, en

---

(²) Para facilitar nuestra función, la disposición final de una moción de supresión de evidencia debe hacerse mediante resolución. *Pueblo v. Corraliza Collazo*, 121 D.P.R. 244 (1988); *Pueblo v. Ortiz Zayas*, 122 D.P.R. 567 (1988).

sana lógica decisoria tenemos que presumir que el juzgador de los hechos creyó la versión que no derrotaría su fallo de culpabilidad.

Estos principios de adjudicación apelativa racional nos obligan a esbozar una versión de hechos distinta a la consignada en la opinión mayoritaria: *la verdaderamente creída por el tribunal sentenciador.* Después de todo hemos resuelto que cuando un testigo se contradice " 'lo que se pone en juego es su credibilidad' y que es 'al jurado o al juez de instancia a quien le corresponde resolver el valor de su restante testimonio' ". *Pueblo v. Cabán Torres,* supra, págs. 656–657. Véase *Pueblo v. Cruz Negrón,* 104 D.P.R. 881 (1976).

## II

El 26 de abril de 1988 Luis Pacheco Rivera, en unión a otros guardias de seguridad de la Autoridad de Tierras, prestaba servicios en los predios de la fábrica de jugos *Lotus,* Barceloneta. Estaba en el portón llevando a cabo unos registros durante la hora de salida de los empleados. El sistema no era diario, sino "sorpresivo", con el propósito de desalentar y evitar el hurto de latas y herramientas de la fábrica. Un letrero en la entrada notificaba a visitantes y empleados de esa posibilidad.

Aproximadamente a las 6:45 A.M., salió de su horario de trabajo Rosario Igartúa. Éste, en una ocasión anterior, había sido registrado (T.E., págs. 204 y 206). Se dirigió hacia el portón de salida. *En sus manos sujetaba una bolsa de papel estraza.* Al acercarse a la caseta de los guardias *y advertir el registro,* se volteó y comenzó a caminar en dirección opuesta. El guardia Pacheco Rivera se percató de ese cambio abrupto de movimiento. Concluyó que el propósito de Rosario Igartúa era notificar del registro a los demás empleados que todavía estaban en la fábrica. Para evitarlo, el guardia Pacheco Rivera le dijo que no podía

virar, sino que tenía que salir. Rosario Igartúa desobedeció esa orden, siguió hacia la parte de atrás de la fábrica y comenzó a correr. A Pacheco Rivera le estuvo muy extraño que éste corriera en esa dirección y lo persiguió hasta un cerro. Mientras huía, Rosario Igartúa sostenía la bolsa en su mano derecha.

Aproximadamente a unos 600 pies (T.E., pág. 32), "antes de llegar al monte casi internándose pues se cansó, yo no se, que se paró y entonces fue cuando yo [Pacheco Rivera] le di alcance y *dejó caer una bolsa*, la bolsa que llevaba en las manos *y ahí fue que lo cogí, cogí la bolsa y lo traje hasta la fábrica.*"(3) (Énfasis suplido.) T.E., pág. 17. Pacheco Rivera lo esposó y condujo a la caseta. Allí entregó a su supervisor, Isabelino Torres, la bolsa. Después, éste la examinó y encontró marihuana.

En el contrainterrogatorio, Pacheco Rivera admitió que no vio a Rosario Igartúa cometer ningún delito y que su intervención la basó en que éste había violado las normas administrativas de *Lotus*. T.E. pág. 43.

## III

Frecuentemente el arresto es la primera fase del procedimiento criminal a la que se expone un ciudadano. Su legalidad determinará la validez de los eventos posteriores. Así, la evidencia producto de un registro incidental a un arresto ilegal no es admisible en la causa criminal.

Ante la importancia que conlleva determinar la legali-

---

(3) Durante el contrainterrogatorio, señaló que primero lo agarró y luego soltó la bolsa. T.E., pág. 38.

Sin embargo, en la Resolución enmendada de 5 de mayo de 1989, el juez que intervino en la vista de supresión de evidencia determinó: "7) Cuando el guardián Pacheco Rivera, quien no lo había perdido de vista e[n n]ingún momento logró darle alcance, el acusado soltó la bolsa que llevaba en la mano la cual cayó en sus pies siendo recogida por dicho guardián y trasladada hasta la oficina de los guardianes junto con el acusado." *Exhibit* I, pág. 2.

dad de un arresto, es indispensable definir el concepto y precisar cuándo ocurrió. La Regla 4 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, procedente del *Cal. Penal Code* Secs. 825–837 (Deering 1983), define el arresto como "el acto de *poner a una persona bajo custodia* en los casos y del modo que la ley autoriza". (Énfasis suplido.) Dicha regla también describe la manera en que ha de efectuarse: "se hará por medio de la *restricción efectiva* de la libertad de la persona o sometiendo a dicha persona a la custodia de un funcionario". (Énfasis suplido.) Íd.

De la definición y descripción de la Regla 4 de Procedimiento Criminal, *supra*, se desprende que para que una intervención propiamente sea un arresto *tiene que ponerse a la persona bajo custodia por medio de la restricción efectiva.* "Un oficial o una persona privada efectúa un arresto con la *captura efectiva* de la persona acusada; o anunciando que el acusado está bajo arresto, *acompañado de una demostración de fuerza y autoridad, a la que se somete el acusado*, implicando que a menos que se someta, será capturado." (Énfasis y traducción nuestros y escolio omitido.) 1 *Wharton's Criminal Procedure* Sec. 51, págs. 273–274 (1989).

Es evidente, pues, que para que se configure fácticamente un arresto, la Regla 4 de Procedimiento Criminal, *supra*, exige una restricción efectiva; *una orden verbal de detención no es suficiente a menos que sea obedecida.* Véanse: *Snabb v. State*, 683 S.W.2d. 850 (1984); *Burkhalter v. State*, 642 S.W.2d 231 (1982). Por sí sola, una demostración de fuerza tampoco configura un arresto, ya que bajo este supuesto es imprescindible que la persona se someta.

Recientemente el Tribunal Supremo federal analizó el concepto "arresto" y cuándo ocurre. *California, Petitioner v. Hodari D.*, 59 L.W. 4335 (1991), específicamente señaló que se *requiere el uso de fuerza física o, en su ausencia, la sumisión a una aserción de autoridad.* Allí unos agentes que transitaban en un vehículo sin rotular notaron a un grupo

de jóvenes reunidos cerca de un automóvil rojo. Cuando los jóvenes vieron que el vehículo de los agentes se les acercaba comenzaron a huir. Al percatarse de lo que ocurría, *sin motivo fundado alguno*, los agentes emprendieron su persecución. Cuando uno de los agentes casi alcanza al joven Hodari, éste dejó caer un pequeño objeto. El agente lo detuvo y esposó. El objeto abandonado resultó ser una piedra de *crack*. El Tribunal Supremo federal resolvió que la persecución —antes de que Hodari soltara la piedra— no constituyó un arresto ya que, si bien hubo una demostración de fuerza (*show of force*), Hodari no se sometió a él. Tampoco hubo uso de la fuerza física. Al no haberse configurado un arresto antes de que Hodari arrojara la piedra de *crack,* ésta resultó ser evidencia abandonada, no ocupada en el transcurso de un registro incidental al arresto.

La definición de un arresto según nuestra doctrina vigente —y de cuándo ocurre— es compatible con la formulada por el más alto foro federal. Desde antes de la Convención Constituyente (véanse los Arts. 114 y 115 del Código de Enjuiciamiento Criminal de 1935) ha permanecido inalterada. Ensancharla acomodaticiamente y adelantar una agenda liberal sería un acto no sólo de legislación judicial, sino de injusta alteración histórica.

## IV

Lo expuesto explica las razones por las cuales no podemos suscribir la opinión mayoritaria. *Los hechos creí dos por el tribunal de instancia no configuran un registro incidental al arresto.* Sencillamente, cuando Rosario Igartúa dejó caer la bolsa que contenía marihuana no había ocurrido un arresto. En esos instantes su libertad aún no había sido restringida efectivamente; tampoco estaba bajo custodia y ciertamente rehusó obedecer la orden verbal del guardia de seguridad Pacheco Rivera.

En *Pueblo v. Ortiz Zayas*, 122 D.P.R. 567 (1988), aclaramos que un objeto se considera abandonado para efectos del Art. II, Sec. 10 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, si la persona renuncia a la expectativa de intimidad sobre él. Aquí Rosario Igartúa soltó la bolsa de marihuana para que no se le vinculara con ésta. *Renunció a la expectativa de intimidad sobre ella.*

En resumen, no puede cuestionarse la validez de la acción del guardia Pacheco Rivera. Éste se encontraba en el descargo legítimo de su trabajo. Sólo pretendía poner en vigor las normas administrativas de la *Lotus*. ¿Cómo puede la mayoría del Tribunal ignorar esta realidad?

Por ajustarse a derecho, confirmaríamos la sentencia.