EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Empresas Puertorriqueñas de Desarrollo, Inc. Peticionaria v. Hermandad Independiente de Empleados Telefónicos y otros Recurrentes | Certiorari 2000 TSPR 71 |
|---|---|

Número del Caso: CC-1998-0625

Fecha: 11/05/2000

Tribunal de Circuito de Apelaciones: Circuito Regional IV

Juez Ponente: Hon. Efraín E. Rivera Pérez

Abogados de la Parte Peticionaria:

> Lcdo. Federico Comas Montalvo
> Lcdo. Edgardo Delgado Brás
> Lcdo. Hiram Meléndez Rivera

Abogados de la Parte Recurrida:

> Lcdo. Luis Roberto Santos
> Lcdo. Pedro Manzano Yates
> Lcda. Eldia M. Díaz Olmo

Abogado del Comité Amplio de
Organizaciones Sindicales,
Cívicas y Culturales:

> Lcdo. Juan Mari Bras

Materia: Injunction Permanente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Empresas Puertorriqueñas de
Desarrollo, Inc.

    Demandante-Recurrido


        vs.                    CC-1998-625       Certiorari

Hermandad Independiente de
Empleados Telefónicos y Otros

    Demandados-Recurrentes

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI.


San Juan, Puerto Rico, a 11 de mayo de 2000.


Nos toca determinar si procedía la expedición de un interdicto preliminar para prohibir unas manifestaciones de protesta realizadas en los predios de un centro comercial privado sin la autorización de sus dueños.

I

Al momento de ocurrir los hechos del caso, la demandante-recurrida, Empresas Puertorriqueñas de Desarrollo, Inc. (Empresas), una corporación organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, era la propietaria del centro comercial Mayagüez Mall, localizado en el Km. 15.4 de la carretera estatal número dos (2), en un predio de más de cien (100) cuerdas de terreno.

En dicho centro existían entonces aproximadamente ciento cuarenta y nueve (149) locales comerciales, que ocupaban alrededor de un millón, cien mil (1,100,000) pies cuadrados de espacio rentable. Entre los establecimientos del centro comercial que ofrecían servicios a sus visitantes se encontraban varias tiendas para la venta de ropa y calzado, una zapatería, una tienda de juguetes, una tienda para la venta de teléfonos, varios bancos y restaurantes, un supermercado, una lavandería, varios salones de belleza y de barbería, varias agencias de viajes, una tienda para la venta de equipo para computadoras, una librería, una farmacia, un centro de juegos de diversión, varias salas de cine, un garaje para la reparación y venta de piezas de automóviles y una estación de gasolina. El centro comercial también poseía unos cinco mil (5,000) espacios de estacionamiento para vehículos de motor. Existían varias vías internas para el tránsito vehícular y peatonal. Tenía seis (6) entradas principales que daban acceso directo a sus pasillos interiores, y puertas adicionales de entrada y salida que daban acceso al interior del centro comercial desde los estacionamientos a través de los locales comerciales. Además, dentro del centro comercial referido existía un cuartel de la Policía de Puerto Rico, una oficina de la Autoridad de Energía Eléctrica, y otra del Departamento de Estado en la cual se atendían solicitudes de pasaportes.

Como parte del Mayagüez Mall, Empresas tenía dos (2) locales alquilados a la Puerto Rico Telephone Company (P.R.T.C.), que era entonces una corporación pública. Uno de esos locales la compañía telefónica lo había dedicado a su "Oficina Comercial" y el otro a su "Departamento de Tráfico de la Región Oeste". Ambos locales tenían puertas de entrada y salida que daban acceso directo a dichos locales desde sus respectivas áreas de estacionamiento. Entre los asuntos que la P.R.T.C. atendía en la Oficina Comercial se incluían el pago y cobro de deudas, las altas y bajas del servicio telefónico y las querellas respecto a dicho servicio. **Esta Oficina Comercial era la única facilidad de la P.R.T.C. en todo el Municipio de Mayagüez que sus abonados y clientes podían utilizar con respecto a los asuntos referidos**.

El 27 de mayo de 1998, el Gobernador de Puerto Rico anunció al país la venta de la P.R.T.C. Como consecuencia de ello, el 18 de junio de 1998, la Unión Independiente de Empleados Telefónicos (U.I.E.T.) y la Hermandad Independiente de Empleados Telefónicos (H.I.E.T.E.L.), cuyo patrono era la P.R.T.C., iniciaron un paro y una huelga indefinida y abandonaron los centros de trabajo. En respaldo de la acción de estas dos uniones se solidarizó el Comité Amplio de Organizaciones Sindicales (C.A.O.S.) que agrupaba diversas entidades sindicales que apoyaban el sentir de los empleados unionados de la P.R.T.C.

En la misma fecha referida, miembros de todas las agrupaciones mencionadas antes (los manifestantes) iniciaron una manifestación de protesta contra la venta de la P.R.T.C. en los predios del centro comercial Mayagüez Mall aledaños a las oficinas de esa compañía. Portando pancartas alusivas a su protesta, los manifestantes se colocaron en pequeños grupos en aquella parte del centro comercial contigua a las puertas de acceso a las oficinas de la P.R.T.C. Igualmente, en dicho lugar colocaron cobertizos para refugiase del sol, sillas, neveras portátiles y alimentos.

El gerente del centro comercial requirió a los manifestantes que abandonaran el área del estacionamiento donde se encontraban, advirtiéndoles que ésta era propiedad privada y que ellos no estaban autorizados a realizar tal actividad en ese lugar. Ante la negativa de los manifestantes de abandonar el lugar referido, el mismo día 18 de junio de 1998 Empresas presentó ante el Tribunal de Primera Instancia una demanda contra aquéllos. Empresas solicitó a ese foro la concesión de un entredicho provisional, así como un interdicto preliminar y uno permanente. Adujo Empresas que las manifestaciones referidas se realizaban sin su autorización o permiso, que afectaban sus intereses y que constituían una violación a su derecho constitucional al disfrute de su propiedad.

El foro de instancia pautó una conferencia entre los abogados de las partes para el 24 de junio de 1998, y

señaló una vista para atender la solicitud del interdicto preliminar para el 29 de junio. Las partes sometieron sus respectivos memorandos de derecho el 1 de julio de 1998 y el caso quedó sometido para la consideración del tribunal.

El 3 de julio de 1998, el Tribunal de Primera Instancia notificó una extensa sentencia en la cual analizó la normativa pertinente al asunto en cuestión. Declaró sin lugar la petición de interdicto preliminar "en cuanto a ordenar la salida de los [manifestantes] del centro comercial". El foro de instancia determinó, *inter alia*, que Empresas no había presentado prueba alguna de que hubiese sufrido daños a la propiedad o de que hubiesen ocurrido actos de violencia o de obstrucción a la entrada del público al centro comercial. Determinó, además, que tampoco se había presentado "prueba alguna de pérdida de ingresos o efectos económicos perjudiciales que guarden relación con la manifestación". En cuanto a la manera en que se realizaron las manifestaciones, señaló el foro de instancia en lo pertinente que:

> ...las actividades de los manifestantes[,] como regla general[,] se han llevado a cabo en el área de la acera, calle y estacionamiento frente a las oficinas alquiladas a la P.R.T.C. Todas las manifestaciones han ocurrido en el exterior del edificio principal. **Como regla general[,] los manifestantes se han mantenido en forma ordenada y pacífica**. (Énfasis suplido.)

No obstante, el foro de instancia encontró probado que en una ocasión, el 25 de junio de 1998, el área ocupada por los manifestantes se había extendido hasta un local aledaño

ocupado por un banco que no pudo ofrecer los servicios de autoventanilla mientras el espacio estuvo ocupado por los manifestantes. En esa ocasión, los participantes utilizaron altoparlantes y "entonaron coros y estribillos, alusivos a la venta de la telefónica, la privatización, el gobierno y en ocasiones utilizaron lenguaje mal sonante y ofensivo". Al reconocer que "tal tipo de manifestación ruidosa y con estribillos disonantes interrumpe la tranquilidad de los usuarios" y que "[l]a armonía de los intereses en disputa puede lograrse evitando los demandados tal tipo de manifestación", el tribunal permitió la continuación de las protestas "de forma pacífica, ordenada y sin ruidos innecesarios en el área que da acceso del estacionamiento a las puertas de la Oficina Comercial y de Tráfico de la P.R.T.C.". Razonó dicho foro que ordenar el desalojo de los manifestantes de los predios del centro comercial "tornaría académico su reclamo" porque estarían "impedidos de llevar su mensaje a quienes acuden a las oficinas en búsqueda de servicio."

En cuanto al uso del centro comercial, el foro de instancia determinó que Empresas había aceptado que el centro comercial se había utilizado antes para actividades no relacionadas directamente con los locales comerciales tales como la exhibición de cómo se fabrica una cerveza, espectáculos musicales y un circo de diversiones; actividades que se llevaban a cabo normalmente fuera del horario de venta en las tiendas. De igual forma, el foro de

instancia encontró probado que Empresas había alquilado sus locales antes para la ubicación de centros de información particulares con fines no comerciales. Específicamente determinó que había alquilado un espacio a personas que abogaban a favor de la construcción en Mayagüez de la planta de energía "Cogentrix". También determinó que Empresas no poseía normas escritas que definiesen el nivel de sonido permitido en el centro comercial, y que anteriormente había permitido el uso de altoparlantes dentro y fuera del centro comercial. Finalmente, el foro de instancia determinó que Empresas no tenía normas escritas que prohibiesen manifestaciones como las de este caso en los predios del centro comercial.

Inconformes con la determinación del foro de instancia, el 9 de julio de 1998 Empresas acudió ante el Tribunal de Circuito de Apelaciones mediante un recurso de certiorari. Dicho foro emitió una sentencia el 17 de julio de 1998, expidió el recurso y revocó el dictamen del tribunal de instancia. Declaró con lugar la solicitud del interdicto preliminar y ordenó el "cese y desista inmediato de las actividades de [los manifestantes] dentro de los predios y edificios del Mayagüez Mall" hasta la disposición final del litigio. Dispuso que los manifestantes podían realizar sus expresiones de protesta en áreas aledañas al centro comercial. Además, el tribunal apelativo ordenó al foro de instancia la celebración de una vista el 24 de julio de 1998 para adjudicar la solicitud de interdicto permanente.

Dicho foro concluyó que el tribunal de instancia "no realizó un ponderado balance de equidad sopesando los intereses de las partes, como paso previo a adjudicar en forma final el asunto crucial sobre si el Mayagüez Mall era una plaza pública, según había sido alegado por [los manifestantes]... y, por ende, efectivamente un foro público".

Inconformes con el dictamen referido, el 23 de julio de 1998, la U.I.E.T. y la H.I.E.T.E.L. acudieron ante nos mediante un recurso de certiorari acompañado de una moción en auxilio de jurisdicción. Plantearon que el Tribunal de Circuito de Apelaciones había errado al emitir el injunction preliminar. En la misma fecha, Empresas también compareció ante nos y solicitó la desestimación del recurso de certiorari instado por los manifestantes.

El 24 de julio de 1998, expedimos el recurso solicitado por los peticionarios. En auxilio de nuestra jurisdicción, ordenamos la suspensión de los procedimientos en el Tribunal de Circuito de Apelaciones, y dejamos sin efecto su dictamen del 17 de julio de 1998. Permitimos así que continuaran las manifestaciones en cuestión. Además, autorizamos al Tribunal de Primera Instancia a continuar en forma expedita con los procedimientos relativos al interdicto permanente solicitado por Empresas, conforme a su dictamen del 3 de julio de 1998.

El 6 de diciembre de 1998, acogimos como su alegato el recurso de certiorari presentado por los peticionarios el

23 de julio de 1998; y el 22 de enero de 1999, Empresas presentó el suyo. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II

## Academicidad

El 2 de agosto de 1999, el foro de instancia desestimó la petición de injunction **permanente** que tenía pendiente en este caso. Determinó que en vista de que la P.R.T.C. ya había sido vendida, y de que las manifestaciones de protesta en el centro comercial habían concluido, "resolver la controversia hoy inexistente sería emitir una opinión consultiva a la empresa demandante en torno a la legalidad y legitimidad de protestas o demostraciones pacíficas en los predios de un Centro Comercial...". (Enfasis suplido.) El tribunal de instancia emitió este dictamen a pesar de que **tanto Empresas como las organizaciones demandadas presentaron sendos escritos oponiéndose a que el caso fuese desestimado por academicidad**.

Inconforme con el dictamen de instancia referido, el 3 de septiembre de 1999 Empresas presentó un recurso de apelación ante el Tribunal de Circuito de Apelaciones, y el 31 de marzo de 2000, el foro apelativo notificó su denegatoria del recurso aludido. Empresas recurrió entonces ante nos y su recurso sobre el injunction permanente se encuentra pendiente de nuestra oportuna consideración.

Aunque ninguna de las partes nos ha planteado que el recurso particular del caso de autos **a su vez** se haya

tornado académico, conviene hacer un breve señalamiento sobre el particular, para que no haya duda sobre nuestra jurisdicción.

En pronunciamientos previos hemos indicado que un caso se torna académico cuando su condición de controversia viva y presente sucumbe ante el paso del tiempo. P.P.D. v. Gobernador I, Op. de 22 de diciembre de 1995, 139 D.P.R. ___, 95 JTS 165; Asoc. de Periodistas v. González, 127 D.P.R. 704 (1991); Noriega v. Gobernador, 122 D.P.R. 650 (1988); El Vocero v. Junta de Planificación, 121 D.P.R. 115 (1988). "Los tribunales pierden su jurisdicción sobre un caso por academicidad cuando ocurren cambios durante el trámite judicial de una controversia particular que hacen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia. Con esta limitación sobre el poder de los tribunales, se persigue evitar el uso innecesario de los recursos judiciales y obviar pronunciamientos autoritativos de los tribunales que resulten superfluos." C.E.E. v. Depto. de Estado, 134 D.P.R. 927, 935-36 (1993); Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 724-725 (1980).

Ahora bien, existen situaciones especiales en las cuales los tribunales pueden atender un caso que se ha tornado académico. Es decir, hemos reconocido antes que existen varias excepciones a la doctrina de academicidad. Una de ellas es cuando en un caso se plantea

una **cuestión recurrente**, es decir, susceptible de volver a ocurrir pero que, por la naturaleza efímera de los hechos que provocan la cuestión, es difícil que logre ser dilucidada por los tribunales. Noriega v. Hernández Colón, 135 D.P.R. 406 (1994); C.E.E. v. Depto. de Estado, supra; El Vocero v. Junta de Planificación, 121 D.P.R. 115 (1988); Asoc. de Periodistas v. González, supra; Com. de la Mujer v. Srio. de Justicia, supra.

En el caso de autos, las manifestaciones específicas que dieron lugar al recurso ante nos han cesado ya, por lo que podría estimarse que la controversia concreta que nos concierne  aquí sobre el injunction preliminar se ha tornado académica. No obstante, es evidente que la cuestión novel e importante que este pleito presenta, de si agrupaciones como las peticionarias pueden llevar a cabo manifestaciones como las del caso de autos en un centro comercial privado, cuando sus dueños se oponen a tales actos, es una que con razonable probabilidad **ha de surgir de nuevo**. El acto de expresión pública impugnado puede volver a concluir antes de que la cuestión referida haya sido dilucidada judicialmente en los méritos. Tal como ha sucedido en el caso de autos, la controversia aludida entre los manifestantes y el centro comercial puede presentarse otra vez y la situación concreta que la ocasiona puede volver a desaparecer mientras el caso es examinado por los

tribunales.[1] En tales circunstancias, si no pasamos juicio sobre la controversia referida aunque haya terminado la manifestación, quedaría conculcada así nuestra función revisora.

En efecto, el importante asunto que tenemos planteado en el caso de autos, ha estado ya antes ante los tribunales del país sin que se haya podido resolver en sus méritos.[2] En el caso anterior referido se intentó impedir otras manifestaciones realizadas precisamente en los predios del centro comercial Mayagüez Mall. Al igual que como ocurrió en el caso ante nos ahora, Empresas había alquilado un local a la Autoridad de Energía Eléctrica (A.E.E.) para la operación de una oficina comercial de servicio al público. El 30 de marzo de 1995, a raíz de una disputa obrero-patronal, empleados de la A.E.E. pertenecientes a la Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico (U.T.I.E.R.) realizaron manifestaciones de protesta contra la A.E.E. dentro del Mayagüez Mall. Como consecuencia de ello, el día siguiente, Empresas presentó una acción ante el Tribunal de Primera Instancia, Sala

---

[1] En este caso la demanda fue presentada no solamente contra la Hermandad Independiente de Empleados Telefónicos y la Unión Independientes de Empleados Telefónicos, sino también contra el Comité Amplio de Organizaciones Sindicales, que es una agrupación obrera activamente involucrada en muchas de las controversias públicas de mayor trascendencia en el país.

[2] Empresas Puertorriqueñas de Desarrollo, Inc. v. U.T.I.E.R., IPE95-0044 (Tribunal Primera Instancia), KLAN-9801174 (Tribual de Circuito de Apelaciones) y CC-2000-229 (Tribunal Supremo de Puerto Rico).

Superior de Mayagüez, y solicitó que se emitiese un entredicho provisional, así como un interdicto preliminar y uno permanente. Luego de la concesión del entredicho provisional y de varios trámites apelativos, el foro de instancia resolvió que la acción de Empresas se había tornado académica en vista de que las manifestaciones de la U.T.I.E.R. habían terminado para el tiempo en que el tribunal se disponía a dilucidar el caso. Por ende, desestimó la acción de Empresas, sin resolver la importante controversia constitucional que se le había planteado. El Tribunal de Circuito de Apelaciones confirmó dicho dictamen. No cabe dudas, pues, que tenemos ante nos una clara situación de una **controversia recurrente**, que es una de las excepciones bien conocidas a la doctrina de la cuestión académica. Resolvemos, pues, que tenemos jurisdicción para dilucidar el importante asunto ante nos.

Debe quedar claro que ésta no es la primera vez que consideramos la validez de actos de protesta **después** que dichos actos han cesado definitivamente. En E.L.A. v. Rivera Rivera, 105 D.P.R. 640 (1977), un grupo de personas montaron un piquete de protesta en las inmediaciones de la Fortaleza, la residencia oficial del Gobernador de Puerto Rico. El Tribunal Superior, a instancias del Estado, expidió un injunction que si bien salvaguardaba el derecho a la libre expresión de los manifestantes aludidos, limitaba a la vez las horas del día en que se podían celebrar los actos de protesta y fijaba otras restricciones

afines. Los manifestantes apelaron de inmediato ante nos, cuestionando las limitaciones impuestas mediante el <u>injunction</u> referido. Inicialmente rehusamos suspender el <u>injunction</u> pendiente la apelación. **Posteriormente, año y medio después de haber terminado los actos de protesta en cuestión, ejercimos nuestra jurisdicción y adjudicamos la validez del <u>injunction</u> referido**. Igual hicimos con respecto a un <u>injunction</u> preliminar y permanente que había sido procurado en relación a un piquete, **luego de éste haber concluido**, en <u>E.L.A. v. Hermandad de Empleados</u>, 104 D.P.R. 436 (1975). Procede, pues, que en el caso de autos actuemos del mismo modo.

Pasemos entonces a examinar el alcance que tiene nuestra garantía constitucional de libertad de expresión en centros comerciales privados como el Mayagüez Mall.

III

Esta es la primera vez que tenemos la oportunidad de expresarnos sobre la aplicación del derecho constitucional a la libertad de expresión en los centros comerciales privados. Por tratarse de un asunto novel en nuestra jurisdicción, es menester considerar los precedentes del Tribunal Supremo de Estados Unidos que puedan ser vinculantes; y a la vez tomar en cuenta por su valor

persuasivo la jurisprudencia pertinente de otras jurisdicciones estatales.[3]


**A.    Las decisiones del Tribunal Supremo de Estados Unidos**

La jurisprudencia del Tribunal Supremo de los Estados Unidos relacionada al asunto que aquí nos concierne comenzó con la histórica decisión de ese foro en Marsh v. Alabama, 326 U.S. 501, 66 S. Ct. 276 (1946). En ésta, se resolvió que en un pueblo operado por una compañía privada ("company town"), en el cual ésta era dueña de los edificios, aceras, calles, tiendas, etc., regía la Primera Enmienda de la Constitución federal. Se determinó que tal lugar era el equivalente funcional de cualquier otro pueblo norteamericano, por lo que en sus predios no podía prohibirse la distribución de material religioso, aunque dichos predios fuesen propiedad privada.

El análisis utilizado en Marsh v. Alabama, supra, fue aplicado nuevamente en Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S. Ct. 1601 (1968). En esta ocasión, el Tribunal Supremo federal reconoció el derecho de unos trabajadores a realizar demostraciones en un centro comercial privado frente a una tienda contra cuyos dueños aquellos mantenían una contienda laboral. El alto foro federal resolvió que, al igual que en Marsh v. Alabama, supra, las

---

[3] Hacemos referencia sólo a aquellos casos cuyas controversias concretas son similares a la que aquí nos concierne.

características del centro comercial en cuestión le convertían en el equivalente funcional de un pueblo común, por lo que le eran aplicables las disposiciones de la Primera Enmienda de la Constitución de los Estados Unidos.

Unos años más tarde, la postura del Tribunal Supremo norteamericano con respecto a la aplicación de la referida Primera Enmienda a centros comerciales varió dramáticamente. La nueva trayectoria comenzó con Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S. Ct. 2219 (1972). Contrario a su determinación en Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., supra, en este caso el Tribunal Supremo federal se negó a reconocer el derecho de un grupo de personas opuestas a la guerra de Vietnam a distribuir propaganda relacionada con sus ideas en los predios de un centro comercial. Se resolvió en ese caso que la actividad referida no era afín con el propósito comercial del establecimiento, y que los manifestantes tenían otros medios eficaces para difundir su mensaje tales como el uso de las calles públicas adyacentes al centro comercial.

Luego, en Hudgens v. N.L.R.B., 424 U.S. 507, 96 S. Ct. 1029 (1976), el Tribunal Supremo de los Estados Unidos fue aun más lejos. En este caso la controversia giraba en torno a las actividades de protesta que realizaron los empleados unionados de un almacén contra sus dueños, por éstos no aceptar ciertas peticiones sometidas por la unión. Los empleados realizaron las manifestaciones en cuestión

frente a una tienda de su patrono que estaba localizada en un centro comercial aunque el almacén donde ellos trabajaban estaba ubicado fuera de los predios del centro comercial. Luego de revocar expresamente lo resuelto en Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., supra, por entender que era inconsistente con lo que se había decidido en Lloyd Corp. v. Tanner, supra, el más alto foro federal resolvió que las garantías provistas por la Primera Enmienda de la Constitución federal sólo aplican a situaciones en las que existe acción estatal ("state action"). Razonó el Tribunal que, por la ausencia de acción estatal en ese caso, la Primera Enmienda no protegía a los manifestantes. No obstante, señaló expresamente **que un estado podía darle una protección a la libertad de expresión conferida por su propia constitución que fuese más amplia que la de la Primera Enmienda federal, y aplicarla incluso a personas o corporaciones privadas**.

Cuatro años después de sus pronunciamientos en Hudgens v. N.L.R.B., supra, el Tribunal Supremo federal se enfrentó a una decisión del Tribunal Supremo de California mediante la cual dicho foro extendió la aplicación de la libertad de expresión de ese estado a un centro comercial privado. En Pruneyard Shopping Center v. Robins, 447 U.S. 74, 100 S. Ct. 2035 (1980), un grupo de estudiantes de escuela superior había colocado una mesa en un centro comercial de California con el propósito de distribuir información y solicitar firmas para una petición pública. Los estudiantes

tuvieron que abandonar el lugar donde estaban ubicados luego de que un guardia de seguridad les informó que su actividad era contraria a las reglas del centro comercial. Dichas reglas prohibían la celebración de actividades públicas en el centro que no estuviesen relacionadas directamente con su propósito comercial. Los estudiantes aludidos instaron acción en un tribunal estatal contra los dueños del centro comercial por la alegada violación a su derecho a la libertad de expresión conferídoles tanto por la constitución federal como por la estatal. El foro de instancia determinó que los estudiantes no tenían razón en su reclamo de libertad de expresión en el centro comercial bajo ninguna de las dos constituciones. El tribunal apelativo confirmó dicha determinación. En revisión, el Tribunal Supremo de California revocó a los tribunales inferiores. Dictaminó que la Constitución de California protegía la expresión de ideas y actividades como las realizadas por los estudiantes, cuando se ejercían razonablemente en centros comerciales, aunque éstos fuesen privados, y que ello no afectaba los derechos de propiedad de sus dueños protegidos por la Constitución federal. Al confirmar el dictamen del más alto foro judicial de California, el Tribunal Supremo de los Estados Unidos reiteró expresamente la facultad de un tribunal supremo estatal, a la luz de la Constitución de ese estado, de ampliar la protección de los derechos constitucionales que confiere la Constitución de los Estados Unidos. Añadió que,

al ejercer dicha facultad, un estado puede imponer válidamente restricciones razonables a los derechos de propiedad privada siempre que con ello no contravenga alguna de las protecciones específicas conferidas por la Constitución federal.

En resumen, pues, aunque el Tribunal Supremo de los Estados Unidos ha limitado significativamente la aplicación de la Primera Enmienda de la Constitución federal a los centros comerciales privados, también ha reconocido que las jurisdicciones estatales en estos casos pueden definir el ámbito del derecho de expresión al amparo de sus propias constituciones de una manera más amplia. Como veremos más adelante, jurisdicciones tan importantes como California, Nueva Jersey, Colorado, Oregon y Washington[4] así lo han hecho.

**B.    Los tribunales de estados con constitución más amplia**

Como hemos indicado ya, el Tribunal Supremo de California ha resuelto que su propia Constitución protege el derecho de expresión de las personas en los centros comerciales privados. Robins v. Pruneyard Shopping Center, 592 P. 2d 341 (1979), confirmado en Pruneyard Shopping Center v. Robins, supra. Dicho Tribunal también ha señalado que este derecho de expresión no es absoluto y puede estar

---

[4] Como se indica más adelante en la opinión, en el estado de Washington se han permitido determinadas actividades en centros comerciales al amparo de una cláusula particular de su constitución, que no es la relativa a la libertad de expresión.

sujeto a restricciones razonables de tiempo, lugar y manera
impuestas por el centro comercial. Dicho foro ha reconocido
expresamente, además, que aunque los derechos de propiedad
de los dueños de los centros comerciales son importantes,
al igual que ocurre con cualquier derecho individual, éstos
están subordinados al interés colectivo. En Schwartz-
Torrance Inv. Corp. v. Bakery & Con. Wkrs. U., 394 P. 2d
921 (1964), el Tribunal Supremo de California resolvió que
los miembros de una unión tenían derecho a realizar
piquetes en las inmediaciones de una panadería localizada
en un centro comercial privado, aun contra la voluntad del
dueño del centro comercial. En esa ocasión, las
manifestaciones de protesta de la unión se realizaron luego
de que ésta trató infructuosamente de organizar
colectivamente a los empleados de la panadería. El más alto
foro judicial de California concluyó lo siguiente:

> [t]he prohibition of the picketing would in
> substance deprive the union of the opportunity to
> conduct its picketing at the most effective point
> of persuasion: the place of the involved
> business.  The interest of the union thus rests
> upon the solid substance of public policy and
> constitutional right; the interest of the
> plaintiff lies in the shadow cast by a property
> right worn thin by public usage. Schwartz-
> Torrance Inv. Corp. v. Bakery & Con. Wkrs. U., a
> la pág. 926.

Cuatro años más tarde, el Tribunal Supremo de California
resolvió el caso de Diamond v. Bland, 477 P. 2d 733 (1970).
En esa ocasión el foro referido concluyó que los dueños de
un centro comercial no podían prohibir en forma absoluta el
ejercicio de los derechos de expresión de los que visitan

tal centro a menos que ello obstaculice o interfiera sustancialmente con la operación normal del negocio de aquéllos.[5]

Otro estado que ha tenido ante sí la cuestión que nos ocupa aquí ha sido Colorado. En Bock v. Westminster Mall Co., 819 P. 2d 55 (Colo. 1991), miembros de una asociación política instaron acción contra los dueños de un centro comercial privado en la que alegaron que la política de prohibir la distribución de hojas sueltas en las áreas comunes del centro comercial violaba el derecho constitucional estatal a la libertad de expresión de los demandantes. En esa ocasión, el tribunal de mayor jerarquía de Colorado resolvió que la participación económica del Estado en el desarrollo del centro comercial y la presencia en éste de varias agencias gubernamentales, incluyendo una sub-estación de la policía de la ciudad, constituían suficiente intervención del Estado en la operación del centro comercial como para activar la cláusula constitucional estatal de libertad de expresión. Señaló dicho foro que la Constitución de Colorado prohibía a los dueños de un centro comercial restringir el derecho del

---

[5] En Robins v. Pruneyard Shopping Center, supra, el máximo tribunal de California ratificó sus dictámenes tanto en Schwartz-Torrance Inv. Corp. v. Bakery & Con. Wkrs. U., supra, como en Diamond v. Bland, aunque estos habían sido resueltos en parte bajo una normativa federal que fue posteriormente revocada. Afirmó su uso como precedentes, señalando que la jurisprudencia federal era relevante pero no conclusiva, en vista de la facultad de los tribunales estatales bajo sus propias constituciones de ampliar el mínimo de protección que el Tribunal Supremo federal determine poseen las garantías constitucionales federales.

público que se congrega en las áreas comunes de dicho lugar a expresarse pacíficamente sobre asuntos políticos. Puntualizó también el foro aludido que las áreas comunes del centro comercial en cuestión se habían convertido en lugares de reunión y expresión pública, transformándose, para todo fin práctico, en un foro público. No obstante, se reconoció el derecho del centro comercial de establecer reglas razonables para restringir el tiempo, lugar y manera para realizar las actividades referidas.

En Lloyd Corporation v. Whiffen, 849 P. 2d 446 (Or. 1993), el Tribunal Supremo de Oregon también reconoció el derecho de sus ciudadanos a solicitar firmas en las áreas comunes de un centro comercial privado, sujeto a restricciones razonables establecidas por el centro comercial sobre el tiempo, lugar y manera de realizar tales actividades. Señaló dicho foro que:

> ...to prohibit the gathering of signatures on initiative petitions in the common areas of large shopping centers such as the Lloyd Center would "impinge on constitutional rights" conferred on the citizens of this state by the provisions of Article IV, section 1, of the Oregon Constitution.
>
> ...
>
> It is true... that the right under Article IV, section 1, to solicit signatures on initiative petitions is a form of speech and that there also are other forms of speech. We see no need in our opinion in this case to anticipate and discuss problems presented by other forms of speech. Lloyd Corporation v. Whiffen, supra, a las págs. 453 y 454.

En New Jersey Coalition v. J.M.B., 650 A. 2d 757 (N.J. 1994), también se aplicó la protección de la cláusula constitucional de libertad de expresión de Nueva Jersey a los centros comerciales privados. En este caso una coalición de diversos grupos opuestos a la intervención de las fuerzas armadas de los Estados Unidos en Kuwait intentó distribuir material relacionado con sus ideas en diversos lugares. Varios centros comerciales permitieron la actividad en sus predios, mientras que otros se opusieron o impusieron condiciones alegadamente muy restrictivas. El Tribunal Supremo de Nueva Jersey, fundamentándose en un análisis desarrollado en un caso previo, State v. Schmid, 423 A. 2d 615 (N.J. 1980), y en su propio examen sobre el valor de la libertad de expresión frente al derecho de propiedad, determinó que los propietarios del centro comercial estaban constitucionalmente obligados a permitir allí la distribución de hojas sueltas que tenía propósitos no comerciales, sujeto a regulaciones razonables. Dicho Tribunal señaló que los centros comerciales referidos tenían todas las características de las áreas de comercio tradicionales ("downtown business district"). Indicó, además, que en dichos centros existía la presencia de policías municipales; y que sus dueños permitían y estimulaban la realización de actividades no comerciales orientadas al público visitante. El Tribunal también determinó que la invitación que se le hacía al público para que visitase el centro comercial era amplia. El Tribunal

concluyó que se podía realizar en los predios del centro comercial cualquier tipo de actividad que era realizable en el área de comercio tradicional ("downtown"). En particular, indicó el Tribunal que la distribución de hojas sueltas con temas como el que tenían las hojas sueltas de ese caso era una actividad que siempre se había realizado en el área de comercio tradicional ("downtown"). El Tribunal reiteró su señalamiento previo de que la libertad de expresión garantizada por la Constitución de ese estado prevalecía contra acciones de entidades privadas que fuesen irrazonables u opresivas. State v. Schmid, supra.

Finalmente, debe mencionarse la posición particular del Tribunal Supremo del estado de Washington. Ese foro, en Alderwood Assoc. v. Wash. Envir. Council, 635 P 2d 108 (1981), revocó una orden emitida por un tribunal de instancia del estado mediante la cual se le había prohibido a una organización ambientalista solicitar firmas y realizar demostraciones en los predios de un centro comercial privado. El más alto tribunal de Washington determinó que dichas actividades estaban protegidas por la constitución estatal. Posteriormente ese Tribunal aclaró cuál era el fundamento preciso de la decisión aludida al señalar que:

> ...the holding in *Alderwood* was simply that people have a right under the initiative provision of the Constitution of the State of Washington to solicit signatures for an initiative in a manner that does not violate or unreasonably restrict the rights of private property owners. We expressly do not here disturb

that holding. <u>Southcenter v. National Dem. Policy Com.</u>, 780 P 2d 1282, 1290 (1989).

## C.    **<u>Otros tribunales estatales</u>**

Los tribunales supremos de un gran número de estados han considerado la cuestión que nos concierne en el caso de autos y han resuelto que **<u>sus propias constituciones no ofrecen una protección a la libertad de expresión que sea mayor que la que surge de la Constitución federal</u>**, según interpretada por el Tribunal Supremo de Estados Unidos. Dichos tribunales han realizado un análisis del asunto similar al utilizado actualmente por el Tribunal Supremo de los Estados Unidos, y han limitado el alcance del derecho de expresión establecido en sus respectivas constituciones a situaciones en las que existe acción estatal ("state action"). De este modo, al resolver que el ámbito de sus propias cláusulas de libertad de expresión no es mayor que el de la Constitución federal, no han permitido manifestaciones como las del caso de autos en centros comerciales privados cuando el Estado no está involucrado. En este grupo se encuentran, entre otros, Minnesota, <u>State v. Wicklund</u>, 589 N. W. 2d 793 (Minn. 1999); Texas, <u>Republican Party of Texas v. Dietz</u>, 940 S. W. 2d 86 (Tex. 1997); Ohio, <u>Eastwood Mall, Inc. v. Slanco</u>, 626 N. E. 2d 59 (Ohio 1994); Carolina del Sur, <u>Charleston Joint Venture v. McPherson</u>, 417 S. E. 2d 544 (S.C. 1992); Georgia, <u>Citizens for Ethical Gov. v. Gwinnett</u>, 392 S. E. 2d 8 (Ga. 1990); Arizona, <u>Fiesta Mall Venture v. Mecham Recall Com.</u>, 767 P.

2d 719 (Ariz. App. 1988); Wisconsin, Jacobs v. Major, 407 N. W. 2d 832 (Wis. 1987); Pennsylvania, W. Pa. Soc. WRKRS v. Conn. Gen. Life Ins., 515 A. 2d 1331 (1986); Nueva York, Shad Alliance v. Smith Haven Mall, 488 N. E. 2d 1211 (N.Y. 1985); Michigan, Woodland v. Michigan Citizens Lobby, 378 N. W. 2d 337 (Mich. 1985); Connecticut, Cologne v. Westfarms Associates, 469 A. 2d 1201 (Conn. 1984); y Carolina del Norte, State v. Felmet, 273 S. E. 2d 708 (N.C. 1981).

IV

**La libertad de expresión en Puerto Rico**

Antes de entrar a resolver el asunto concreto que está ante nuestra consideración aquí, es menester señalar que reiteradamente hemos reconocido que las interpretaciones que hace el Tribunal Supremo federal sobre el contenido de los derechos fundamentales conferidos por la Constitución de los Estados Unidos sólo constituyen el mínimo de protección que tenemos que reconocer bajo nuestra propia Constitución a esos derechos. Dichas interpretaciones no limitan nuestra facultad para reconocer mayor amplitud a las garantías constitucionales conferidas por la Constitución de Puerto Rico. Así, hemos determinado antes que nuestra Constitución tiene una **factura más ancha** que la Constitución federal con respecto a derechos tales como la prohibición del menoscabo de obligaciones contractuales [Bayrón Toro v. Serra, 119 D.P.R. 605 (1987)], la

prohibición contra registros y allanamientos irrazonables [Pueblo v. Meléndez Rodríguez, Op. de 13 de julio de 1994, 136 D.P.R. __, 94 JTS 103; Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Malavé González, 120 D.P.R. 470 (1988); Pueblo v. Falú Martínez, 116 D.P.R. 828, (1986); Pueblo v. Dolce, 105 D.P.R. 422 (1976)]; la intimidad [Ramírez de Ferrer v. Mari Brás, Op. de 18 de noviembre de 1997, 144 D.P.R. __, 97 JTS 134; E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, (1975)]; **y la libertad de expresión** [U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153 (1993)].

Más aun, ya antes hemos resuelto que la Constitución del Estado Libre Asociado "tiene un origen y un historial distinto a la Constitución de Estados Unidos... **nuestra Constitución reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora que la Constitución de Estados Unidos**". López Vives v. Policía de P.R., 118 D.P.R. 219 (1987). Nuestra doctrina jurisprudencial, pues, es cónsona con la determinación del Tribunal Supremo federal en Lloyd Corp. v. Tanner, supra, reiterada en Pruneyard Shopping Center v. Robins, supra, que reconoce el derecho de las jurisdicciones estatales a ampliar la protección de los derechos fundamentales al amparo de sus propias constituciones más allá de lo dispuesto por la Constitución federal según interpretada por el Tribunal Supremo de Estados Unidos.

La sección cuarta del Artículo II de nuestra Constitución consagra el derecho de toda persona a la libre expresión. En la Asamblea Constituyente se reconoció que este derecho se debe **"ejercitar a plenitud dentro de la más dilatada libertad..."**. Diario de Sesiones de la Convención Constituyente de Puerto Rico (Equity, 1961), Vol. 4, pág. 2564. De igual forma, hemos expresado que el derecho a la libertad de expresión fue concebido, entre otras cosas, "para facilitar el desarrollo pleno del individuo y estimular el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático". Velázquez Pagán v. A.M.A., 131 D.P.R. 568, 576 (1992). Expresamente hemos reconocido y reiterado la preeminencia de la libertad de expresión en nuestro ordenamiento constitucional, Mari Brás v. Casañas, 96 D.P.R. 15, 206 (1968), "que nos obliga a su más celosa protección", Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 255 (1979).

En efecto, en el pasado hemos sido tan celosos con la protección de la libertad de expresión que la hemos reconocido aun en circunstancias que se apartan de las que son las más comunes para las manifestaciones de protesta y para el intercambio y la crítica de ideas. Aunque hemos reconocido que fuera de los foros públicos tradicionales el Estado tiene amplias facultades para restringir la libertad de expresión, no obstante hemos hecho hincapié en que aun en tales foros poco tradicionales **no puede prohibirse absolutamente el ejercicio de este derecho tan fundamental**.

U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153 (1993). Así pues, hemos convalidado el derecho a fijar pasquines en postes de alumbrado y en las columnas de puentes sin necesidad de la autorización de sus custodios en Pueblo v. Arandes de Celis, 120 D.P.R. 530 (1988) y Mari Brás v. Alcaide, 100 D.P.R. 506 (1972). Igualmente hemos reconocido el derecho de estudiantes a celebrar mítines y marchas en terrenos universitarios aun cuando existía un trasfondo de violencia en la institución causado por una huelga laboral en Sánchez Carambot v. Dir. Col. Univ. Humacao, 113 D.P.R. 153 (1982). Asimismo hemos protegido el derecho de maestros a celebrar reuniones en predios escolares durante la hora de almuerzo en Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251 (1979); y hemos permitido el uso de altoparlantes en la vecindad de colegios electorales en Mari Brás v. Casañas, 96 D.P.R. 15 (1968).

En nuestros pronunciamientos ordinarios sobre el alcance de la protección constitucional a la libre expresión, hemos indicado que ésta depende en gran medida del lugar o foro en que se desea ejercer ese derecho. Como se sabe, en los denominados foros públicos tradicionales le hemos reconocido una protección amplia y abarcadora. Hemos señalado en Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229 (1988), a las págs. 241 y 242, que:

> [d]esde tiempos inmemoriales los parques, las plazas y las calles de Puerto Rico han constituido foros de divulgación, de intercambio y de crítica de ideas. Es en ellos en donde la conciencia ciudadana y particular forma de ver el mundo tienen impacto y repercuten. **Son los foros**

> **públicos por excelencia para la divulgación y expresión de ideas.** Las calles en particular constituyen un instrumento eficaz de divulgación de ideas accesible para aquellos individuos y grupos que no cuentan con suficientes recursos económicos y que no tienen, por tanto, acceso a los medios de comunicación masiva como lo son la radio, la televisión y la prensa. (Enfasis suplido. (Citas omitidas.)

A pesar de la importancia que han tenido los foros públicos para la divulgación e intercambio de ideas, es menester reconocer, sin embargo, que la vitalidad de esos lugares tradicionales para la expresión pública ha ido menguándose paulatinamente, al menos en las comunidades urbanas del país. Los lugares de reunión en los cuales las personas tradicionalmente realizaban la divulgación y el intercambio de ideas de forma gratuita y efectiva -las plazas, los parques y las calles- han ido suplantándose por otros sitios en los cuales las personas hoy día ejercen libremente el intercambio de ideas y la crítica sobre lo que acontece en la colectividad, actividades que tan importante sitial tienen en nuestro país.

Al expresarnos previamente sobre esta situación, hemos señalado que en Puerto Rico los centros comerciales han ido sustituyendo las plazas públicas y otros lugares tradicionales como centros de reunión. Así, en J.A.D.M. v. Centro Com. Plaza Carolina, 132 D.P.R. 785, (1992), a la pág. 791, indicamos:

> [l]os grandes centros comerciales, los regionales y subregionales, ofrecen todo tipo de servicios complementarios, tales como bancos, restaurantes, sitios de comida ligera, centros de juegos de diversión y cines, entre otros.   En estos

modernos centros de mercadeo, bajo techo y equipados con aire acondicionado y amplio estacionamiento, en ocasiones, debido a las facilidades de acceso y comodidades que les brindan a las personas en la comunidad, también se ofrecen servicios gubernamentales, tales como correo, facilidades para el pago de facturas de agua, luz y teléfono, la obtención de documentación oficial, como pasaportes, etc. Con el propósito de atraer al mayor número de personas posible, estos centros comerciales periódicamente ofrecen espectáculos y atracciones no sólo comerciales, sino también artísticas, educativas, deportivas y cívicas. **La combinación de todos estos factores ha hecho que en ocasiones los centros comerciales hayan venido a sustituir las plazas públicas y otros centros de reunión en las comunidades**. (Enfasis suplido.)

Conscientes de lo anterior, a la luz de la normativa reseñada previamente, pasemos a analizar la controversia que nos ocupa.

V

Según se señaló antes, las manifestaciones en controversia en el caso de autos tenían como objetivo protestar contra la determinación gubernamental de vender la corporación pública conocida como la P.R.T.C. Entre los manifestantes se encontraban empleados de la corporación referida y otros obreros pertenecientes a agrupaciones sindicales que manifestaban su rechazo a la venta de la P.R.T.C. Las **<u>únicas</u>** oficinas comerciales de la compañía telefónica en el área de Mayagüez estaban localizadas en los predios del centro comercial en cuestión. Allí tenían que acudir los clientes de la P.R.T.C. a realizar los trámites necesarios para obtener los servicios telefónicos

que interesaban. **Para los peticionarios ese era el lugar más idóneo en Mayagüez para expresar su oposición a la venta de la P.R.T.C.** Así lo reconoció el propio foro de instancia al expresar que "[era] difícil concebir un mejor lugar de expresión para informar a los usuarios de la P.R.T.C. la manifestación en contra de la venta y la privatización". Más aun, en términos funcionales, las oficinas de la P.R.T.C. aludidas constituían un lugar público, un predio gubernamental en el cual ni siquiera el Estado puede prohibir el ejercicio de la libertad de expresión absolutamente. Cuando Empresas alquiló los locales en cuestión a la P.R.T.C., que era entonces una **corporación pública**, ésta sabía que no se trataba de un arrendatario privado sino de una entidad del Estado Libre Asociado de Puerto Rico, que estaba sujeta a normas y requerimientos distintos a los de un mero cliente privado. Como bien señaló el tribunal de instancia, si en estas facilidades de la P.R.T.C. se pueden prohibir en forma absoluta las manifestaciones públicas, ello significaría que cualquier entidad gubernamental puede privar a sus empleados u otras personas de llevar a cabo actividades que están constitucionalmente protegidas sólo con alquilar locales para sus oficinas de servicio al público en centros comerciales privados, **lo que sería intolerable.**

A lo señalado en el párrafo anterior hay que añadirle el hecho incontestable de que el centro comercial en cuestión es un lugar vital para los residentes de la región

donde se llevan a cabo múltiples y numerosas actividades comunales y al cual acuden miles de personas diariamente para atender muchos asuntos importantes. Al momento de los hechos del caso de autos, en dicho centro comercial se ofrecían servicios bancarios, de zapatería, de lavandería, de farmacia y de librería. Además de numerosas tiendas para la venta de toda clase de artículos de uso diario, había allí restaurantes, un supermercado, salones de belleza y barbería, agencias de viaje, un garaje para la reparación de vehículos de motor, salas de cine y una estación de gasolina. Ocupando un predio de terreno que excedía las 100 cuerdas, dicho centro tenía miles de pies cuadrados dedicados a los 5,000 espacios de estacionamiento y a las varias vías para el tránsito peatonal y vehícular que allí existían. **Se trata evidentemente del equivalente contemporáneo del núcleo tradicional de nuestros pueblos**, que ha venido a sustituir la plaza pública, los parques y las calles principales de éstos como centros de reunión y de convivencia de las personas, y que además lo hacen comparable en su carácter cuasi público al "company town" de Marsh v. Alabama, supra.

No podemos ignorar, además, que los establecimientos comerciales de gran magnitud, como el que aquí nos concierne, con frecuencia se dedican deliberadamente a la tarea de realizar distintos tipos de actividades sociales, culturales y de otra índole con el propósito de fomentar la visita continua del mayor número de personas a dichos

establecimientos. En gran medida, pues, la sustitución de los lugares tradicionales de reunión de las personas por los centros comerciales ha sido el resultado de un empeño concertado de los dueños de estos centros.

Finalmente, debe tomarse en cuenta el significativo nexo del Estado con el centro comunal en cuestión. En dicho centro existía un cuartel de la Policía de Puerto Rico. Además de las oficinas de la P.R.T.C., que entonces era una corporación pública, allí existían también otras oficinas gubernamentales como la de la Autoridad de Energía Eléctrica y la del Departamento de Estado. Más aun, como en todo centro comercial del tamaño del Mayagüez Mall, también existía allí un contingente de guardias de seguridad, que tienen autorización del Estado para portar armas y para velar por el orden y la paz pública en los establecimientos privados, lo que es una función que tradicionalmente le compete al Estado. Véase, Pueblo v. Rosario Igartúa, 129 D.P.R. 1055 (1992). Todos estos numerosos vínculos del Estado con el centro comercial referido destacan y fortalecen el carácter que tenía el Mayagüez Mall de ser funcionalmente equivalente al núcleo vital tradicional de nuestros pueblos, comparable a un "company town".

Los dueños del centro comercial en cuestión han invocado ante nos su derecho al disfrute de la propiedad privada como fundamento para la autoridad que reclaman de prohibir según les plazca la celebración en dichos centros de actividades como las de los manifestantes en este caso.

No cabe duda de que el derecho de toda persona al disfrute de la propiedad está reconocido en la sección 7 del Artículo II de la Constitución de Puerto Rico. Sin embargo, reiteradamente hemos señalado que este derecho no es absoluto, y que cede ante situaciones en las cuales debe prevalecer el bienestar común y el interés público. Velázquez Velázquez v. E.L.A., 135 D.P.R. 84 (1994); Vázquez v. A.R.P.E., 128 D.P.R. 513 (1991); The Richards Group v. Junta de Planificación, 108 D.P.R. 23 (1978). Al referirnos al desarrollo del concepto de propiedad actual indicamos en The Richards Group v. Junta de Planificación, supra, a la pág. 35, que:

> ...la propiedad en las sociedades democráticas tradicionales entraña determinados derechos, pero... estos viven en competencia continua con otros intereses, privados y públicos, de importancia cambiante y en ocasiones creciente. La extensión de esos derechos y el grado a que tienen que ceder ante otros valores dependen de las circunstancias de cada controversia. (Citas omitidas.)

En el caso de autos, las distintas circunstancias mencionadas antes aparejan una limitación al derecho de propiedad de Empresas. Según hemos señalado, el lugar concreto donde se llevaron a cabo las manifestaciones de los peticionarios constituía funcionalmente un apéndice o prolongación de unas facilidades gubernamentales. Más aun, estas facilidades estaban ubicadas en un enorme centro comercial, que tenía otros vínculos importantes con el Estado, y que, además, era análogo al núcleo vital de nuestros pueblos y ciudades. En tales circunstancias, el

lugar aludido se asemejaba jurídicamente al foro público tradicional, en el cual no se puede prohibir de manera absoluta el ejercicio de la libertad de expresión.

Como señalamos antes, los que formularon nuestra Carta de Derechos nos impusieron la grave responsabilidad de asegurar que en nuestro país los derechos de expresión habrán de ejercerse a plenitud, dentro de la más dilatada libertad. **Esa responsabilidad incluye la labor de atemperar estos preciados valores jurídicos a nuestra cambiante realidad.** Nadie puede negar que la intensa transformación de nuestras comunidades urbanas ha ido desplazando inexorablemente los foros públicos tradicionales de modo tal que aspectos dinámicos de nuestra convivencia y del diálogo colectivo ocurren con gran frecuencia, no ya en las plazas y parques públicos y en las calles de nuestras ciudades, sino en centros como el que aquí nos concierne. Por ello, si nos aferramos a la realidad del pasado, si insistimos en que sólo esas plazas, parques y calles son los foros principales para el ejercicio de la libertad de expresión, faltaríamos al mandato constitucional. El libre intercambio de ideas y la crítica pública entonces quedarían reducidos de modo notable. Nuestro proceso democrático se empobrecería. Se pondría en riesgo "la discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del ser humano, como para la conservación y el sostenimiento del bienestar común...".

Sánchez Carambot v. Dir. Col. Univ. Humacao, supra, a la pág. 161.

En varias ocasiones antes hemos insistido en que al interpretar nuestra Constitución debemos garantizar la continuada vigencia de sus valores fundamentales frente a las nuevas realidades del país. Este principio cardinal lo reafirmamos en Nogueras v. Hndez. Colón, 127 D.P.R. 405, 411 (1990), al señalar que:

> "debemos evitar que interpretaciones inflexibles y el apego a viejos modelos impidan su aplicabilidad a las eventualidades del futuro y en pocos años tornen obsoleta una constitución diseñada para guiar la vida de un pueblo por varios siglos... ...Tampoco debemos olvidar que 'el sentido de hoy no es siempre el sentido de mañana' [y que l]a interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas. Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 410 (1988), y casos allí citados."

Ya anteriormente lo habíamos reiterado de manera palmaria en P.I.P. v C.E.E., 120 D.P.R. 580, 613 (1988), al señalar que:

> "La permanencia y estabilidad de nuestra Constitución depende, en última instancia, de su capacidad para responder a los distintos problemas sociales, económicos y políticos a que se enfrenta el país. Como intérpretes máximos de este documento no podemos limitar su alcance ni congelar sus principios a la época en que se promulgaron. Al interpretar sus postulados básicos nunca debemos olvidar que '[u]na Constitución no establece, ni debe establecer, normas para la hora que pasa, sino principios para un futuro que se expande'. B.M. Cardozo, La naturaleza de la función judicial, Buenos Aires, Eds. Arayú, 1955, pág. 64.
>
> Hay que evitar pronunciamientos que la fosilicen y la conviertan en una pieza de museo de historia.";

y en <u>López Vives v. Policía de P.R.</u>, <u>supra</u>, al afirmar que:

> "*al interpretar sus contornos, debemos garantizar su vigorosidad y relevancia a los problemas socio-económicos y políticos de nuestro tiempo.*"

El cardinal principio aludido lo explicamos con elocuencia en <u>P.R. Tel. Co. v. Martínez</u>, 114 D.P.R. 328, 350 (1983), al señalar respecto a nuestra Constitución que:

> "*Su vitalidad descansa en su dinamismo. Es un documento que rebasa las preferencias personales de sus autores y plasma las esperanzas de ulteriores generaciones. Su factura es moderna, de lenguaje claro y sencillo, susceptible a una continua renovación. No está escrito en lengua extinta, arduo de descifrar y referente a asuntos esotéricos. Interpretamos una Constitución, no los Rollos del Mar Muerto...*
>
> *...*
>
> '*...En buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin,...* <u>Figueroa Ferrer [v. E.L.A.</u>, 107 D.P.R. 250, 278 (1978)]'".

Todas estas esclarecidas expresiones sobre nuestra ingente función de interpretar la Constitución de Puerto Rico **a la altura de los tiempos** son particularmente ciertas cuando se trata de la libertad de expresión, que esa Constitución garantiza de manera más abarcadora y más amplia que la Constitución de los Estados Unidos. Ello es así porque la libertad de expresión tiene una jerarquía sin par en nuestro ordenamiento constitucional como la piedra angular de nuestro sistema de vida democrático. Lo

señalamos del modo siguiente recientemente en Coss y U.P.R.

v. C.E.E., 137 D.P.R. 877, 886 (1995):

> "La libertad de expresión es la quinta esencia de una sociedad democrática. De forma multidimensional, en la constelación de valores democráticos, goza de una primacía peculiar. Todo individuo está en la libertad de poder expresar sus opiniones según su conciencia. Esta libertad intenta proteger jurídicamente el libre desenvolvimiento de la personalidad **a través de los medios más eficaces** y habituales de exteriorización de los contenidos de conciencia." (Citas omitidas; énfasis suplido).

Nos compete asegurar que esta preclara concepción de la libertad de expresión no sea mera retórica. Tenemos el deber de hacerla valer plenamente frente a las cambiantes realidades del país y evitar así que pueda convertirse gradualmente en sólo una vivencia del pasado.

En resumen, pues, la proyección contemporánea de la amplia libertad de expresión que garantiza nuestra propia Constitución nos requiere resolver que esa libertad tan preeminente no puede conculcarse de modo absoluto en un lugar como el que aquí nos concierne concretamente, que por sus características medulares se asemeja jurídicamente al foro público tradicional. En lugares tan particulares como el referido, los dueños de la propiedad pueden establecer normas vinculantes sobre el tiempo, el espacio y el modo de expresarse, a fin de que no se afecten sustancialmente las actividades legítimas del establecimiento. **Lo que no se puede hacer es prohibir absolutamente la libertad de expresión**, que es esencial para la discusión pública de temas tan importantes como el de este caso.

Estamos conscientes de que un centro mercantil como el del caso de autos, a pesar de ser funcionalmente el equivalente del antiguo núcleo vital de nuestros pueblos, sigue siendo una propiedad privada dedicada al comercio. Por ello, sus dueños pueden limitar la actividad expresiva en el centro a aquella que sea razonablemente compatible con los objetivos comerciales para los cuales éste se estableció. Pueden reglamentar el tiempo, el lugar y la manera de la expresión de modo que no se alteren sustancialmente las actividades comerciales. Pueden evitar que manifestaciones como las del caso de autos lleguen a constituir un entorpecimiento real y serio de las prácticas comerciales de negocios aledaños. Lo que los dueños del centro no pueden hacer es prohibir en forma absoluta las actividades de expresión. Como en tantas otras ocasiones en el ámbito jurídico, la clave en este asunto radica en lograr un balance entre los intereses en conflicto: la libertad de expresión de los manifestantes, por un lado, y el derecho de los dueños de la empresa a conducir sus negocios sin interferencias injustificadas, por otro. La razonabilidad de las restricciones que impongan los dueños dependerá de las circunstancias particulares de cada caso, que los tribunales deberán sopesar de surgir conflictos. Mari Brás v. Casañas, supra, a la pág. 21.

Los dueños aquí no tenían normas escritas para circunscribir razonablemente la conducta de los manifestantes. Por el contrario, las facilidades al centro

comercial habían sido usadas antes para la divulgación de información con fines no comerciales. Con ese trasfondo, no estaban en posición de prohibir de ningún modo las manifestaciones pacíficas y ordenadas que aquí nos conciernen. Resolvemos, pues, que no procedía el interdicto preliminar solicitado por Empresas. Erró el foro apelativo al conceder dicho interdicto, y al ordenar a los manifestantes a cesar y desistir absolutamente de sus actividades.

VI

Por los pronunciamientos antes expuestos, procede revocar la referida sentencia del Tribunal de Circuito de Apelaciones y, en su lugar, reinstalar el dictamen del Tribunal de Primera Instancia.

Se dictará sentencia conforme a lo señalado.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Empresas Puertorriqueñas de
Desarrollo, Inc.

    Demandante-Recurrido

        vs.                CC-1998-625      Certiorari

Hermandad Independiente de
Empleados Telefónicos y Otros

    Demandados-Recurrentes

SENTENCIA

San Juan, Puerto Rico, a 11 de mayo de 2000.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente sentencia, se revoca la del Tribunal de Circuito de Apelaciones y, en su lugar, se reinstala el dictamen del Tribunal de Primera Instancia.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Corrada del Río emitió opinión disidente en parte y concurrente en parte. El Juez Asociado señor Rebollo López no intervino.

                  Isabel Llompart Zeno
                    Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Empresas Puertorriqueñas de
Desarrollo, Inc.

    Demandante-Recurrido

      v.                   CC-1998-625

Hermandad Independiente de
Empleados Telefónicos y Otros

    Demandados-Recurrentes

Opinión Disidente en parte y Concurrente en parte emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO

San Juan, Puerto Rico a 11 de mayo de 2000.

Disiento de la Opinión de la mayoría en este caso por entender que la controversia ante nos se tornó académica, por lo cual este Tribunal está emitiendo una opinión consultiva; en los méritos, concurro con el resultado por fundamentos que no coinciden completamente con la opinión mayoritaria.

I

La academicidad es una doctrina de autolimitación judicial que mira hacia la relación entre eventos pasados y el caso actual para determinar si aún existe un caso o controversia

que satisfaga los requisitos de justiciabilidad. Un caso se torna académico cuando, por el paso del tiempo, ha perdido su característica de ser una controversia presente y viva, de manera que su resolución se convertiría en una opinión consultiva. Uno de los elementos esenciales de una controversia real lo constituye el interés opuesto o antagónico de las partes.[6]

La academicidad constituye una de las manifestaciones concretas del concepto "justiciabilidad", que, a su vez, acota los límites de la función judicial. *C.E.E. v. Dpto. de Estado,* 134 D.P.R. 927, 934 (1993). En todos los casos, tiene que haber una controversia genuina y viva, en la cual estén presentes intereses opuestos, y que al ser resuelta afecte las relaciones jurídicas de los litigantes.

Por lo tanto, los tribunales no están constituidos con el fin de resolver cuestiones de derecho especulativas y abstractas, o para establecer reglas que sirvan de normas futuras a las personas en sus negocios y relaciones sociales; sino que están limitados en su acción judicial a las verdaderas controversias en que necesariamente están envueltos los derechos legales de las partes y que pueden ser resueltos concluyentemente. *E.L.A. v. Aguayo,* 80 D.P.R. 554, 583, nota 30 (1958).

Los fundamentos para sostener la doctrina de academicidad son, a saber: (1) evitar el uso innecesario de los recursos judiciales; (2) asegurar suficiente contienda adversativa sobre las controversias para que sean competente y vigorosamente presentados ambos lados, y (3) evitar un precedente innecesario. *Noriega Rodríguez v. Hernández Colón,* 135 D.P.R. 406 (1994).

No obstante, la jurisprudencia ha reconocido varias situaciones en que, a manera de excepción, no aplica la doctrina de

---

[6] Raul Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I,

academicidad. Entre otros, se trata de aquellos casos en que, (1) se plantea una cuestión capaz de repetirse, y que por su naturaleza evade o hace muy difícil dilucidarla nuevamente ante los tribunales; (2) donde la situación de hecho ha sido cambiada por el demandado pero que no tiene visos de permanencia, o (3) aquellos casos que aparentan ser académicos, pero que en realidad no lo son por sus consecuencias colaterales.[7]

En el presente caso, la mayoría entiende que no estamos ante una controversia académica ya que la misma es susceptible de repetirse y es probable que evada la jurisdicción de los tribunales. No podemos concurrir.

Los casos federales principales que abordan esta excepción a la doctrina de academicidad son: *De Funis v. Odegaard,* 416 U.S. 312 (1974) y *Roe v. Wade,* 410 U.S. 113 (1973). En *De Funis*, supra, el peticionario solicitó admisión a una escuela de derecho y le fue denegada. Instó una acción civil impugnando los criterios de admisión de dicha universidad y alegó que se discriminaba contra él por razón de raza y que también se violaba el debido proceso de ley. El tribunal de instancia concedió un *injunction* obligando a la escuela a matricular al demandante, hasta que se dictase sentencia final y firme en el caso, el cual fue apelado hasta el Tribunal Supremo federal. Para esa fecha el peticionario cursaba su tercer y último año de derecho. Allí, el Tribunal Supremo federal no entró en los méritos del caso y sostuvo que éste era académico, ya que **para la fecha en que se hubiese decidido en su fondo, el peticionario habría conseguido el remedio que ahora le solicitaba al Tribunal.** En este caso el Tribunal entendió que, de la universidad no modificar su criterio de admisión y éste se impugnara en el futuro, dicho

---

pág. 104.
[7] *Íd.,* a la pág. 122.

Tribunal podría resolver con la rapidez necesaria para evitar la academicidad.

En *Roe v. Wade*, supra, se impugnó la constitucionalidad de las leyes penales de Texas que prohibían el aborto. Allí el Tribunal Supremo federal rechazó el planteamiento de academicidad ya que el período de gestación embrionaria en los seres humanos solamente dura 266 días y en todos los casos el embarazo siempre terminaría antes de completarse el proceso de apelación. Razonó que un pleito sobre un embarazo jamás sobreviviría las etapas de un juicio y se le denegaría a todo apelante la revisión judicial. Es decir, aquí se aplicó la excepción de que la controversia es "susceptible de repetición, pero que elude la jurisdicción".

Por lo que hemos discutido, es razonable concluir que la aplicación de la referida excepción a la doctrina de academicidad se da en la situación en que hay una "expectativa razonable" o una "probabilidad demostrable" de que la misma controversia recurrirá envolviendo a la misma parte promovente.[8]

Así también lo afirma *Tribe*, al explicar esta excepción:

> Under this doctrine, in the absence of a claim for class treatment, a litigant must establish that: "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cesation or expiration, and (2) there [is] reasonable expectation that the same complaining party [will] be subjected to the same action again."[9]

Mediante este análisis el Tribunal no tuvo la intención de concluir que una mera posibilidad física o teórica era suficiente para satisfacer dicho análisis. *Murphy v. Hunt,* 455 U.S. 478, 482 (1981). Si así fuera, cualquier asunto de corta duración sería revisable, eludiendo la doctrina de academicidad. *Íd.* Por el contrario, el Tribunal Supremo federal ha resuelto que debe existir una probabilidad razonable o demostrada de que la misma controversia es capaz de recurrir, involucrando a la misma parte promovente. *Íd.* Es decir, para que esta excepción

---

[8] *Íd,* a la pág. 123.

[9] L.H. Tribe, *American Constitutional Law*, Ed. Foundation Press, Nueva York, 2da. Ed., 1988, págs. 84-85, citando a *Weinsten v. Bradford,* 423 U.S. 147, 149 (1975).

aplique es necesario que se satisfagan ambos factores: probabilidad de recurrencia que involucre a la misma parte promovente, y probabilidad demostrada o expectativa razonable de que, de recurrir la controversia nuevamente, se tornará académica. No es posible concebir "otros protagonistas" ni adjudicarle una interpretación laxa a lo que constituye la "misma controversia", ya que existe el peligro de que la excepción se trague la regla.[10]

En *C.E.E. v. Dpto. de Estado*, supra, el Juez Asociado Hernández Denton abordó esta excepción en su opinión concurrente y le imprimió la importancia debida a los requisitos de que "probablemente se repita; a la misma parte promovente, y que evite revisión por razones temporales."[11]

II

Evaluado el expediente del caso de marras surge que no existe ninguna controversia a resolver entre las partes. Además, no nos encontramos ante una de las excepciones a la aplicación de la doctrina de academicidad. La empresa recurrente aduce que la excepción anteriormente discutida es aplicable al presente asunto y que por lo tanto el tribunal de instancia debió haber emitido la orden interdictal solicitada. No nos persuade.

Es inescapable concluir que el caso de entredicho preliminar presentado por la recurrente se tornó académico, toda vez que los hechos que dieron lugar a dicha solicitud cesaron. La protesta realizada por los recurrentes tenía el propósito de evitar la venta de acciones de la PRTC a la empresa privada, la cual ya se llevó a cabo. La intención del entredicho preliminar -que es el asunto pendiente ante nos- era evitar que los manifestantes realizaran su protesta dentro de los predios del Mayagüez Mall. Tal propósito ya no está presente. Siendo una realidad indiscutible la referida venta, el remedio perseguido por los recurrentes ya no posee vigencia alguna. Por lo tanto, al igual que en *De Funis*, supra, nos enfrentamos a un caso en que la recurrente obtuvo el remedio que buscaba con el entredicho preliminar: que los manifestantes salieran de sus predios.

Más importante aún, la empresa promovente del remedio extraordinario de entredicho preliminar, no ha demostrado la probabilidad o la expectativa razonable de que el asunto o situación que dio lugar a la presente controversia se repita nuevamente y, que de recurrir, evada la revisión judicial.

Como expusiéramos anteriormente, la mera posibilidad física o teórica de que recurra la situación y de que evada la revisión judicial, no es suficiente para satisfacer el análisis establecido por el Tribunal Supremo federal y avalado por nuestra jurisdicción. *Murphy v. Hunt,* supra. Es por ello que un caso en el cual se solicite un remedio interdictal, se puede tornar académico cuando la condición impugnada es de duración limitada y cesa de existir antes de su revisión final. *Tribe*, supra, a las págs. 83-84.

Es menester resaltar, que en la controversia particular ante nos, los procedimientos de *injunction* permanente llevados a cabo ante el Tribunal de Primera Instancia fueron desestimados por razón de academicidad el 2 de agosto de 1999. Dicho dictamen fue confirmado por el Tribunal de Circuito de Apelaciones mediante sentencia de 27 de marzo de 2000. Empresas Puertorriqueñas de Desarrollo, Inc. presentó un recurso de

---

[10] J.J. Alvarez González, *Derecho Constitucional*, 61 (Núm. 4) Rev. Jur. U.P.R. 637, 666 (1992).

[11] *C.E.E. v. Dpto. de Estado,* supra, a la pág. 946.

certiorari ante nos, CC-2000-398, el cual está pendiente de ser considerado. Cabe preguntarnos, si los procedimientos sobre *injunction* permanente fueron correctamente desestimados por razón de academicidad, ¿cómo vamos a entender y a resolver que el entredicho preliminar no es académico? Lo que hace la mayoría al resolver este caso, es emitir una opinión consultiva a la recurrida en torno a la legalidad y legitimidad de protestas o demostraciones en los predios de su centro comercial.

III

Dado el criterio erróneo de la mayoría de que éste caso no es académico, nos vemos precisados a examinar los méritos del importante asunto ante nuestra consideración.

La Primera Enmienda de la Constitución federal dispone:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free excercise thereof; or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

La Constitución del Estado Libre Asociado de Puerto Rico dispone, en la sección 4, Artículo II, que "no se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios."

Este derecho a la libre expresión –al igual que todos los derechos individuales esbozados en la Constitución del Estado Libre Asociado de Puerto Rico (con excepción del derecho a la intimidad) y en la Constitución federal– es oponible únicamente contra el estado. Es decir, los derechos individuales constituyen limitaciones al ejercicio de los poderes del estado y no a las actuaciones privadas. Por consiguiente, es un requisito indispensable que exista una "actuación del estado" (*state action*) que amenace o restrinja un derecho individual para que proceda plantear judicialmente alguna violación de un derecho constitucional.[12]

Una situación particular en la que se pueden reivindicar derechos constitucionales individuales ante partes privadas es cuando se mezclan actos privados y públicos. Esta doctrina es conocida como "doctrina del nexo entre el estado y la actuación privada."[13]

Se establece la relación conforme a cuatro variedades de nexos o contactos con el estado, a saber: "otorgamiento de licencias a la empresa privada y su reglamentación por el Estado; beneficios mutuos de la empresa privada con el Estado; ayudas y subsidios por el Estado a la empresa privada; y uso de facilidades públicas por la empresa privada."[14] Sin embargo, no existe una fórmula precisa, realizándose el análisis caso a caso.[15]

Al amparo de la Primera Enmienda federal se ha desarrollado la doctrina del foro público, que parte de la premisa de que no hay un derecho absoluto a ejercer la libertad de expresión en la

---

[12] Serrano Geyls, supra, Vol. II, pág. 799.

[13] *Íd* a la pág. 809.

[14] *Íd.*

[15] *Íd.*

propiedad pública. El mero hecho de que la gente pueda entrar y salir libremente no convierte automáticamente la propiedad pública en un foro público. *United States v. Grace,* 461 U.S. 171, 177-178 (1983).

Entre los tipos de propiedad pública se destaca el foro público tradicional, el cual, por tradición, ha sido destinado a la reunión pacífica y al debate público, tales como calles, aceras y parques. *Perry Ed. Assn. v. Perry Local Educators',* 460 U.S. 37 (1983). Así lo reconocimos en *U.N.T.S. v. Srio. de Salud,* 133 D.P.R. 153, 163 (1993), y adoptamos el análisis establecido en *Perry,* supra.

En los foros públicos tradicionales, el estado no puede prohibir de manera absoluta el ejercicio de la libertad de palabra. Sólo podrá reglamentar el tiempo, lugar y modo de expresarse, siempre que la reglamentación sea neutral al contenido de la expresión, responda a un interés gubernamental significativo, limite la intervención a la mínima necesaria para alcanzar su objetivo y deje abiertas alternativas para la expresión. *Perry,* supra, a la pág. 46.

El segundo grupo lo componen los foros públicos por designación. Los constituyen aquellas propiedades públicas que el estado ha abierto a la actividad expresiva. Una vez abiertos, aplican en éstos las mismas limitaciones al poder gubernamental de reglamentar la expresión que se emplean en los foros públicos tradicionales. *U.N.T.S. v. Srio. de Salud,* supra, a la pág. 163.

La tercera categoría la componen los foros no públicos. Son aquellas propiedades públicas que no son ni foros públicos tradicionales ni foros públicos por designación. *Íd,* a la pág. 164. En estos lugares, la protección a la libertad de expresión es menor, ya que el estado puede limitar la actividad expresiva a aquella que sea compatible con el objetivo para el cual fue creada esta propiedad pública. *Íd.* La reglamentación de la expresión será válida siempre que sea razonable, aunque no tiene que ser la única ni la más razonable, neutral en cuanto a puntos de vista y siempre que no sea parte de un esfuerzo por suprimir la expresión. *Íd.*

Al interpretar situaciones como la presente, el Tribunal Supremo federal, en *Scott Hudgens v. N.L.R.B.,* 424 U.S. 507 (1976), concluyó que un centro comercial no tiene la equivalencia funcional a un foro público. Así también, en *Lloyd Corporation, Ltd. v. Donald Tanner,* 407 U.S. 551 (1972), el Tribunal Supremo federal determinó que la operación del centro comercial dirigida al uso público, no significa que tal propiedad privada esté expuesta al ejercicio de los derechos garantizados por la Primera Enmienda de los visitantes a sus facilidades dentro de las mismas, cuando tales expresiones no tienen relación con sus operaciones. Concluyó, que los centros comerciales no pierden su carácter privado y su protección bajo la Decimocuarta Enmienda de la Constitución de los Estados Unidos —de disfrutar su propiedad— meramente porque el público es generalmente invitado a usar esas facilidades con el propósito de hacer negocios con los inquilinos del centro comercial.

Como expone la mayoría, en *Pruneyard Shopping Center v. Robins,* 447 U.S. 74 (1980), el Tribunal Supremo de Estados Unidos reiteró la facultad de un tribunal supremo estatal, a la luz de la Constitución de ese estado, de ampliar la protección de los derechos constitucionales que confiere la Constitución federal. Añadió que al ejercer esa función, un estado puede imponer válidamente restricciones razonables a los derechos de propiedad privada siempre que con ello no contravenga alguna de las protecciones específicas conferidas por la Constitución federal.

De esta forma, estados como California y Colorado han resuelto que sus constituciones garantizan el derecho a la libertad de expresión en centros comerciales privados. Específicamente, el Tribunal Supremo de Colorado, en *Bock v. Westminster Mall,* 819 P.2d 55 (Col. 1991), determinó que la participación económica del estado en el desarrollo del centro comercial y la presencia en éste de varias agencias gubernamentales constituían suficiente intervención del estado en la operación de dicho centro como para activar la cláusula constitucional estatal de libertad de expresión. Determinó que el centro comercial se había convertido para todo fin práctico en un foro público.

Haciéndose eco de estas expresiones y fundamentándose en que nuestra Constitución es de factura más ancha que la federal, la mayoría virtualmente le confiere al centro comercial en cuestión categoría de foro público tradicional, cometiendo un grave error, ya que al considerar la validez de la reglamentación del ejercicio del derecho a expresarse libremente, hay que distinguir entre la propiedad pública con carácter de foro público y otros tipos de propiedad.

En el presente caso estamos ante propiedad privada, en la cual es arrendatario el estado. El mero hecho de que haya oficinas de servicio del gobierno en un centro comercial privado, no puede conferirle a dicho centro carácter de foro público tradicional. La mayoría –citando a *J.A.D.M. v. Centro Com. Plaza Carolina,* 132 D.P.R. 785 (1992)– le confiere virtualmente cualidad de foro público tradicional al centro comercial privado, ya que dichos centros han ido sustituyendo las plazas públicas y otros lugares tradicionales como centros de reunión.[16] Nuestras expresiones en *J.A.D.M.,* supra, no tuvieron el efecto que le atribuye la mayoría.

Al resolver como lo hace hoy, la mayoría no visualiza las consecuencias jurídicas que acarrea su *ratio decidendi.* En primer lugar, equiparar un centro comercial privado a una plaza pública, coloca aquella propiedad en la misma situación en que se encuentran los foros públicos tradicionales, donde no puede prohibirse de manera absoluta la expresión, ni pueden establecerse clasificaciones por razón del contenido del mensaje. Es decir, le impone a la propiedad privada un análisis más oneroso que a aquellas propiedades públicas que constituyen foros no públicos, tales como las escuelas y los hospitales. *Véase: U.N.T.S. v. Srio. de Salud, supra.* Ello en contra de lo resuelto por el Tribunal Supremo federal en *Scott Hudgens v. N.L.R.B.,* supra, en el cual se expresó que un centro comercial no tiene la equivalencia funcional a un foro público.

En segundo lugar, existe un conflicto de libertad de expresión *versus* el derecho al disfrute de la propiedad. La decisión de la mayoría despacha el derecho al disfrute de la propiedad que tiene la recurrida, Empresas Puertorriqueñas, con el hecho de que las circunstancias del presente caso aparejan una limitación a ese derecho. Pero realmente, no se lleva a cabo un juicio valorativo de ambos intereses contrapuestos, ni se visualizan las serias limitaciones al derecho al disfrute de la propiedad de la recurrida.

Es meritorio precisar, que el antedicho balance ha sido adoptado por algunas jurisdicciones que han eliminado el requisito de "acción estatal" en relación con los derechos bajo la Primera Enmienda. Así el Tribunal Supremo de New Jersey, en *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.,* 650 A. 2d 757 (N.J. 1994) adoptó un análisis para balancear los intereses de libertad de expresión con el derecho

---

[16] Opinión del Tribunal, a las págs. 28 y 29.

al disfrute de la propiedad de los dueños de un centro comercial. Dispuso que se deben tomar en consideración: (1) la naturaleza, propósito y uso primario de la propiedad; es decir su uso normal; (2) el alcance y naturaleza de la invitación al público para utilizar la propiedad, y (3) el propósito de la actividad de expresión llevada a cabo en relación con los usos tanto privados como públicos de la propiedad. *Íd.*, a la pág. 771.

En el presente caso la mayoría debió realizar un análisis balanceado entre los intereses contrapuestos. *A contrario sensu* obvió, que el hecho de que exista un nexo entre el centro comercial y el estado, no es óbice para conferirle categoría de foro no público, en donde la libertad de expresión se garantiza, pero de forma menos onerosa para la recurrida, ya que ésta podrá limitar las actividades expresivas a aquéllas que sean compatibles con el objetivo para el cual fue creada su propiedad. Así lo resolvimos en *U.N.T.S v. Srio.,* supra, en donde sin duda había "actuación del estado" y se limitó el derecho a la libre expresión en un hospital público. También hemos limitado la libertad de expresión en predios residenciales, *E.L.A. v. Hermandad de Empleados,* 104 D.P.R. 436 (1975) y en las escuelas, *Rodríguez v. Srio. de Instrucción,* 109 D.P.R. 251 (1979).

IV

Concluimos, que en un centro comercial privado, en el cual se encuentran ubicadas oficinas gubernamentales, existe "actuación del estado" cuando nos enfrentamos al derecho de libertad de expresión. No por ello, se trata de un foro público tradicional, sino de un foro no público, en el cual se podrá limitar la libertad de expresión más allá de tiempo, lugar y modo, así como limitarse las actividades expresivas a aquéllas que sean compatibles con el objetivo para el cual fue creada la propiedad.

A tenor, si un centro comercial privado decide arrendarle espacios al estado, tendrá que permitir que, **en una forma ordenada y reglamentada por dicho centro**, se lleven a cabo manifestaciones que estén relacionadas con los servicios o actuaciones que lleva a cabo dicha institución gubernamental, sin menoscabar el derecho al disfrute de la propiedad que tienen los propietarios de dicho centro.

Se trata de armonizar, en este caso específico, el derecho a la libertad de expresión con el derecho al disfrute de la propiedad. Es decir, se trata de un justo balance de intereses entre los que desean hacer una expresión en torno a las actividades realizadas por las instituciones gubernamentales y los derechos afectados por dicha actividad. Después de todo, nuestra Constitución garantiza tanto el derecho a la libre expresión como el derecho al disfrute de la propiedad. Este último no puede ser limitado al máximo como pretende la opinión mayoritaria. El análisis tiene que salvaguardar ambos derechos.

Por tales motivos concurrimos limitadamente con las Partes III, IV y V de la opinión mayoritaria de este Tribunal. Modificaríamos el dictamen del Tribunal de Circuito de Apelaciones, en vez de revocarlo, para atemperarlo a las normas contenidas en nuestra opinión.

Baltasar Corrada del Río
Juez Asociado